[Civ. No. 27925. First Dist., Div. Four. May 16, 1972.]

PAUL WILSON, a Minor, etc., Plaintiff and Respondent, v.
A. E. GILBERT et al., Defendants and Appellants.

608

## COUNSEL

Bledsoe, Smith, Cathcart, Johnson & Rogers, Leighton M. Bledsoe and R. S. Cathcart for Defendants and Appellants.

Werchick & Werchick and Arne Werchick for Plaintiffs and Respondents.

## OPINION

**RATTIGAN, J.**—This medical malpractice action was commenced against A. E. Gilbert, M. D., Napa Medical Group, and others, on behalf of Paul Wilson, a minor (to whom we hereinafter refer as "Paul" or "respondent"). Dr. Gilbert and Napa Medical Group appeal from a $300,000 judgment entered against them upon a jury verdict finding them liable in that amount.[1]

The medical evidence consists exclusively of the testimony of Paul's father, Dr. Gilbert, Dr. Cofer, and Dr. Nobis. All were called by respondent; appellants called no medical witnesses, and Dr. Gilbert testified only under call by respondent as an adverse witness pursuant to Evidence Code section 776. Respondent's evidence supports the following conclusions: While on a hunting expedition in Lake County, on August 12, 1961, Paul suffered an accidental gunshot wound in his left thigh. His father took him to St. Helena Hospital, which is in Napa County. Dr. Paladini, who met him at the hospital, called in Dr. Gilbert. The latter, a "general surgeon," recognized that Paul's femoral artery had been severed and that vascular surgery would be required to restore it.

Although Dr. Gilbert had had no training in such surgery, he did not call in a vascular surgeon. He undertook to reconnect the artery surgically, using a portion of Paul's saphenous vein in a grafting procedure.

---

[1]Napa Medical Group appeared as a party defendant after having been served as "Fourth Doe." The facts that it was a partnership at relevant times, and that Dr. Gilbert was acting as a partner and in the course and scope of the partnership business at such times, were stipulated in open court. The appeal does not involve the action's disposition against any party defendants other than Dr. Gilbert and Napa Medical Group (appellants). Respondent filed notice of a cross-appeal, which was subsequently dismissed.

He did not perform an arteriogram beforehand, nor did he have one performed, to determine whether circulation in the femoral artery had become obstructed by blood clots. The operation did not restore the arterial circulation in Paul's leg. In a pretrial deposition, Dr. Gilbert attributed this result to clotting; at the trial, he in effect recanted his deposition testimony and testified that the cause of the surgical failure could have been arterial "spasm."

Because of the unsatisfactory surgical results, Dr. Gilbert performed a second vein graft on Paul. He then amputated the boy's leg below the left knee, and discharged him in October 1961. After Paul had been removed to his home following that event, Dr. Cofer and other physicians (not including Dr. Gilbert) noted excessive drainage from the amputated stump, granulated and "dying" tissue at the site, and infection. This involved and required further surgical procedures, in the course of which more portions of Paul's leg were removed.

Dr. Nobis, a vascular surgeon, directly testified that Dr. Gilbert had not followed the standard of care (or "standard medical practice") applicable to vascular surgery in Napa County in 1961; that the first femoral graft had been "improperly done"; that the restoration of arterial circulation had been frustrated by presurgical clotting in the artery; and that, in Dr. Gilbert's failure to perceive the clotting by an arteriogram or other appropriate procedure, applicable medical standards had not been followed.

### Sufficiency of the Evidence

We do not find it necessary to discuss the evidence further; contrary to appellants' first contention on the appeal, the evidence is amply sufficient to support the verdict and judgment. In the sequence of appellants' other contentions next stated, we reject them as well; we therefore affirm the judgment.

### The Amount of the Verdict

Contending that the $300,000 verdict was excessive as a matter of law, appellants cite an array of decisions dealing with other plaintiffs and with other amputations or disabling injuries. This argumentative tactic is not persuasive. "While a reviewing court, in passing upon the question involved here, may consider amounts awarded in similar cases [citations], in the final analysis the question in each case must be determined from its own peculiar facts and circumstances [citation] and it cannot be held as a matter of law that a verdict is excessive simply because the amount may be larger than is ordinarily allowed in such cases. It is only in a case where the amount of the award of general damages is so disproportionate to the

injuries suffered that the result reached may be said to shock the conscience, that an appellate court will step in and reverse a judgment because of greatly excessive . . . general damages." (*Daggett* v. *Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 666 [313 P.2d 557]. Cf. *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507-508 [15 Cal.Rptr. 161, 364 P.2d 337]; *Henninger* v. *Southern Pacific Co.* (1967) 250 Cal.App.2d 872, 882-883 [59 Cal.Rptr. 76].) ■ Having in mind that Paul, a teen-aged boy with a substantial life expectancy, lost his lower leg and experienced several painful surgical procedures required by the original damage, we cannot say that the amount of the verdict was such as to "shock the conscience."

## The Jury Instructions

■ (1) Appellants proposed, and the trial court rejected, an instruction telling the jury that, when more than one equally probable cause could have produced the injury, the plaintiff must prove which one caused the injury; and that, should the plaintiff fail to prove a cause for which appellants were responsible, then the plaintiff would not have sustained his burden of proof. The proposed instruction was taken from *Beary* v. *Smart* (1966) 242 Cal.App.2d 13 [51 Cal.Rptr. 306]. That decision approved the instruction in a res ipsa loquitur case: this was not the situation here, where no res ipsa loquitur instructions were given at all. Further, since the jury was instructed generally on the requisite burden of proof and jury instructions are to be read as a whole in determining their sufficiency (*Mallott* v. *Blue Diamond Corp.* (1957) 156 Cal.App.2d 186, 190 [319 P.2d 391]), it would appear that the proposed instruction was inappropriate, unnecessary and properly refused.

■ (2) Appellants contend that the trial court erred in instructing the jury that, in determining whether a specialist should have been consulted, it (the jury) should rely upon evidence presented by physicians and surgeons "called as expert witnesses." Appellants argue that this instruction in effect told the jury that it could not rely upon Dr. Gilbert's testimony because he was not "called as an expert witness." Relative to the general standard of care to be exercised, Dr. Gilbert requested, and the court gave, an instruction that the jury could not set up an arbitrary standard, but was required to rely upon evidence presented by physicians and surgeons "called as expert witnesses." Appellants having requested the substance of the same instruction challenged, their point in this regard is without merit. (*Yolo Water & Power Co.* v. *Hudson* (1920) 182 Cal. 48, 51 [186 P. 772]; *Barlin* v. *Barlin* (1957) 156 Cal.App.2d 143, 148-149 [319 P.2d 87]. Cf. *Elisalda* v. *Welch's Sand & Gravel Co.* (1968) 260 Cal.App.2d 46, 51-52 [67 Cal.Rptr. 57].)

(3) On the morning that final jury arguments were to commence, Dr. Gilbert offered a "present cash value" instruction which was similar, in pertinent part, to BAJI (4th ed. 1956) No. 175-G. (See also BAJI (5th ed. 1969) No. 14.70.)[2] The trial court refused it (1) for the principal reason that it was offered too late and (2) because there had been no expert evidence on the "present cash value" factor, which was not otherwise within the "common knowledge" of the jury. The instruction having been offered after the first trial witness had been sworn, and upon a general-damages issue which had not emerged from the trial evidence and had been squarely tendered in the complaint, it was not offered within the time limit set by law. (Code Civ. Proc., § 607a.) ■ Whether the instruction should have been given in that circumstance, or refused because offered too late, rested within the discretion of the trial court (*id., Young v. Carlson* (1954) 128 Cal.App.2d 743, 746 [276 P.2d 23]); no abuse of discretion has been shown here.[3]

■ The trial court was also correct in refusing the proposed instruction, on its merits, for lack of evidence which would have supported a jury finding of the "present cash value" of any sum assessed as the value of Paul's future earning capacity (to which the instruction was directed; see fn. 2, *ante*). The computation of such "present cash value" is "difficult and confusing . . . to present to a jury" (Johns, Cal. Damages Law and Proof (1969) § 191, p. 178) and, in the pertinent cases (cited *ibid.*), the computation was apparently reached by the respective juries upon the basis of real evidence. (E.g., *Deshotel* v. *Atchison, T. & S. F. Ry. Co.* (1956) 144 Cal.App.2d 224, 229-230 [300 P.2d 910]; *Henninger* v. *Southern*

[2]The jury was later instructed on Paul's life expectancy and that, in fixing damages, the jury should consider "the extent, if any, to which it is reasonably certain that . . . [Paul] . . . will sustain an impaired power to earn money in the future by reason of . . . [his] . . . injury." The proposed instruction, here footnoted, would have further instructed the jury as follows:

"With reference to loss of earning capacity the expectancy of life as a wage or salary earner should be taken into consideration. After finding the value in dollars of what the plaintiff's loss of future earning capacity is reasonably certain to be, you must then find and award him only the present cash value of such future damage. Present cash value is the present sum of money which, together with interest thereon when invested so as to yield the highest rate of interest consistent with reasonable security, will pay to the plaintiff the equivalent of his loss of earning capacity at the times, in the amounts, and for the period that you find plaintiff would have received earnings in the future had he not been injured. The present cash value will, of course, be less than the amount you find to be his loss of future earning capacity."

[3]So far as the record shows, the trial judge did not note, on the instruction, that he had refused it because of the time element in the statute. (Code Civ. Proc., § 607a.) Appellants have not raised this point; moreover, the judge stated to counsel that the instruction was "rejected chiefly because it was filed too late." As this statement clearly informed counsel of a reason for the court's rejecting the instruction, it amounted to substantial compliance with the statute. At least this, but not more, was required. (*Young* v. *Carlson, supra,* 128 Cal.App.2d 743 at p. 746.)

*Pacific Co., supra,* 250 Cal.App.2d 872, 884.) Absent such evidence in the present case (and there was none), this jury would have been put to sheer speculation in determining (as the proposed instruction would have had it do) "the present sum of money which, together with interest thereon when invested so as to yield the highest rate of interest consistent with reasonable security, will pay to the plaintiff [Paul] the equivalent of his loss of earning capacity . . . in the future . . . ." (See fn. 2, *ante.*) The instruction would have required the jury to reach this result without the benefit of evidence or advice as to the complicated factors of compounding and discounting which the instruction necessarily involved. There are "present cash value" tables which might have assisted the jury in this regard, if judicially noticed for instruction purposes (see Johns [*op. cit. supra*], §§ 196-197, pp. 181-186), but the proposed instruction included no reference to them. For these reasons, and on the instruction's merits, the trial court did not err in refusing to give it.

■ (4) Dr. Gilbert requested an instruction dealing with a physician's right to limit his obligation to a patient by undertaking to treat him with reference to a certain ailment, time or place only. While the instruction would not incorrectly state the law in an appropriate factual context, there was no evidence here that Dr. Gilbert had undertaken to limit his obligation in any sense before committing the acts of malpractice; and these acts occurred, setting all their consequences in motion, before he discharged Paul as a patient. The instruction was properly refused.

■ (5) Appellants contend that the trial court erred in instructing the jury that it could consider the failure of a party to produce evidence, which was available to him, in determining what inferences to draw from the evidence against him. In support of this contention, appellants argue that there was no evidence that they *had* failed to produce evidence and that the instruction "gave the jury the impression that the defendant had suppressed evidence." As to the second point, the instruction is designed to give precisely that impression, as the logical conclusion of a trial record which supports it. As to the first point, Dr. Gilbert produced no evidence on the issue of liability. It further appears that, although he had Paul examined by Dr. Mathewson on May 5, 1969 (apparently for purposes of this litigation), Dr. Mathewson was not called as a witness. As Paul's attorneys observe, "[w]hen a defendant in a medical negligence case does not even take the stand in his own behalf . . . it seems that the questioned instruction is singularly appropriate." No error was committed in this regard.

## The Evidence of Subsequent Training

■ Over objection, Dr. Gilbert was required to testify that, after having treated Paul, he had taken "a course on giving arteriograms." Also over objection, his deposition testimony was admitted to the effect that, after his experience with Paul, he referred similar cases to vascular surgeons. Citing Witkin, California Evidence (2d ed. 1966) section 385, page 343, appellants claim that this was error by reason of the rule excluding evidence of "subsequent precautions." The facts shown in this testimony, however, had to do with Paul's "probable condition" when he was under treatment by Dr. Gilbert, and with the latter's observations at the time; accordingly, the testimony was admissible under a familiar exception to the rule cited. (Witkin, *op. cit. supra,* § 385, par. (b), pp. 343-344.) It was also admissible, in each instance, because it tended to impeach Dr. Gilbert in the respective testimonial context. (See Evid. Code, § 1151, Law Revision Com. comment; Note (1958) 9 Hastings L.J. 316.) For either or both reasons, no error appears; or, if error occurred in this regard, the totality of the evidence indicates that it is not reasonably probable that a result more favorable to appellants would have been reached in the absence of such error. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 834-837 [299 P.2d 243].)

## Venue

In their closing brief, appellants state that the venue in this case (in the City and County of San Francisco) was not "obtained in good faith." Their references to the record on appeal do not support the essential conclusion that the cause was tried in the wrong place. As raised at this juncture, the venue point is without merit.

The judgment is affirmed.

Devine, P. J., concurred.