[Civ. No. 41334. First Dist., Div. One. Sept. 30, 1980.]

FREDERICK A. ROSENER et al., Plaintiffs and Respondents, v. SEARS, ROEBUCK & COMPANY, Defendant and Appellant; JOSEPH F. HARTMAN et al., Interveners and Respondents.

**COUNSEL**

Heller, Ehrman, White & McAuliffe, Richard L. Goff, George G. Weickhardt and Marilyn R. Podemski for Defendant and Appellant.

Jewel & Leary, Howard H. Jewel, Boxer & Elkind, Stanley Blackfield and Duane B. Beeson for Plaintiffs and Respondents and for Interveners and Respondents.

OPINION

**NEWSOM, J.**—The present appeal is from judgments after jury trial in favor of respondents and against appellant Sears, Roebuck & Company aggregating $158,000 in compensatory and $10 million in punitive damages.

It is unnecessary to engage in an exhaustive analysis of the voluminous evidentiary record compiled during the 36-day trial. Viewing that record in a light favorable to the judgment below, the following salient facts are disclosed.

In June 1970, Sears, Roebuck actively promoted a national campaign called "Sears Add-A-Room," using license agreements with improvement contractors under which Sears received payment based upon 10 percent of the gross contract price between the licensed contractor and the homeowner. United Remodeling Systems, Inc. (URS) was licensed by Sears to provide such services in California, utilizing the nationally recognized Sears logo, together with a performance bond guaranty under a collateral suretyship arrangement with Commercial Standard Insurance Company (CSI).

During 1972, United States Financial Corporation (USFC) initiated efforts to acquire URS, and, with Sears' approval, assumed active management of its Add-A-Room program operations.

In January 1973, following USFC's decision to abandon the acquisition plan, the undercapitalized and financially shakey URS operation failed, with some 200 outstanding improvement contracts, mainly in California, in various stages of completion. Thereafter, Sears, together with CSI, reluctantly undertook to complete the unfinished work under the contract terms including the written guarantees. Rejecting CSI's adamant insistence that Sears bear equal if not full responsibility for costs of completion as a "de facto principal" on the surety bond, Sears initiated independent action by notifying program customers of URS's "bankruptcy" and advising them to press their claims for full performance against CSI without mention of the latter's liability disclaimer. Sears did, however, advise its customers that it would "cooperate in resolving this matter," while directing customer inquiries to designated Sears' executives.

By early spring, CSI had, with Sears' knowledge, begun corrective and completion work on outstanding contracts in Northern California through Neway Construction, an independent entity organized by Robert Freeman, former manager of USR's regional operations.

Evidence at trial established convincingly that respondents entered into Add-A-Room contracts principally in reliance on Sears' national reputation, as well as past satisfactory relations with the company. In every instance, it appears, Sears' promotional campaign, including its standard assurance of satisfactory service, was a factor in respondents' decisions to enter into the program. Each respondent paid the full amount of the contract price immediately upon execution of the contract; six of the eight couples took out second mortgages on their residences in order to finance the improvements.

Respondents' individual experiences with URS, Sears, CSI and Neway, though widely varied, reflected a pattern of nonfeasance, shoddy workmanship, inconvenience, unreasonable delay, utter indifference, and, ultimately, attempted avoidance of responsibility.

The damages inflicted by this callous and negligent course of conduct included physical and emotional distress, unconscionable invasions of privacy, property damage, financial disruption and attendant frustration and despair. The record is replete with saddening examples of the injuries thus inflicted, varying from the loss of a family Bible caused by leaks in an unrepaired roof, to the total loss of privacy suffered by an entire family forced to sleep in the same room when the interior walls of their home were left unrepaired. Justifiable refunds were sought and consistently refused, and promises were regularly made and broken.

Withal, it is no exaggeration to describe Sears' treatment of respondents as arrogant, high-handed, and characterized by indifference to clear contractual obligations and an exclusive preoccupation with profits.[1] It was on this general state of the evidence that punitive damages were assessed, as noted, in the amount of $10 million.

On appeal, Sears advances several arguments supporting reversal: (1) that the punitive damage award is improper and excessive; (2) that the

---

[1] Indeed, not only did Sears resolutely deny requested refunds while continuing to accept its 10 percent commission license fee, but it steadfastly maintained its nonliability in relation to the designated surety.

compensatory damage awards were unsubstantiated and excessive; and (3) that certain procedural and instructional errors were committed.

I

Appellant challenges the $10 million punitive damage award on the grounds that it is not based upon sufficient evidence of fraud or malice, and that it is excessive as a matter of law. ■ For reasons we now state, we conclude that the award is based upon substantial evidence, but find merit in appellant's claim that the amount is excessive, and accordingly vacate the amount and remand with directions.

The jury returned special verdicts finding that Sears committed fraud by misrepresenting itself as a party to the Add-A-Room contracts, and by promising to guarantee performance of those contracts without intending to honor the promise.

■ Appellant correctly notes that a punitive damage award must be based upon a finding of malice as well as fraud. (*Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891, 894 [99 Cal.Rptr. 706].) Even without a showing of personal animus, however, "malice in fact" may be established. ■ As explained in *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908 at page 922 [114 Cal.Rptr. 622, 523 P.2d 662]: "...'intent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he knows are substantially certain to result from his conduct. (Rest.2d Torts, § 8a; Prosser, Torts (4th ed. 1971) pp. 31-32.) ■ The jury in the present case could reasonably infer that defendants acted in callous disregard of plaintiffs' rights, knowing that their conduct was substantially certain to vex, annoy, and injure plaintiffs. Such behavior justifies the award of punitive damages. ■ As stated in *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 713...: 'malice in fact, sufficient to support an award of punitive damages...may be established by a showing that the defendant's wrongful conduct was willful, intentional, and done in reckless disregard of its possible results.' (Accord: *Black* v. *Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362, 369....)" Further, "When there is express fraud there is evil motive [malice]." (*Walton* v. *Anderson* (1970) 6 Cal.App.3d 1003, 1010 [86 Cal.Rptr. 345].) ■ And it is well established that a promise made without an intention of performing it constitutes actionable fraud. (*Fowler* v. *Fowler* (1964) 227 Cal.App.2d 741, 748 [39 Cal.Rptr. 101]; *Shyvers* v. *Mitchell* (1955) 133 Cal.App.2d 569, 574 [284 P.2d 826].) "...it has been re-

peatedly stated that '[w]ithout the consideration of other evidence, subsequent failure to perform [a promise] warrants the inference that [the promisor] did not intend to perform when [he] promised.' [Citations.]" (*Kuffel* v. *Seaside Oil Co.* (1970) 11 Cal.App.3d 354, 360 [90 Cal.Rptr. 209].)

Appellant's conduct both prior to and following the default of URS evidenced an unwillingness to act in accordance with its promises and representations, and belied its insistence that its conduct merely establishes the negligent performance of its remedial program, rather than an intent to ignore its promises at the time they were made. Sears' contractual arrangements with URS and its bonding company, its entirely inadequate responses to legitimate customer complaints, its dilatory and evasive referral of those problems to URS and the bonding company, and its stubborn insistence that it had no remedial obligations, all support the conclusion that—contrary to its earlier representations—from the first Sears intended to divorce itself from responsibility for the Add-A-Room program.

We therefore conclude, in light of the entire record, that the findings of fraud and malice which justify imposition of punitive damages are supported by substantial evidence. (*Beck* v. *State Farm Mut. Auto. Ins. Co.* (1976) 54 Cal.App.3d 347, 354 [126 Cal.Rptr. 602].)

We agree with appellant, however, that even though the evidence justified *some* award of punitive damages, the amount fixed by the jury was excessive as a matter of law. In making this argument, appellant has primarily focused on the lack of relationship between the punitive and compensatory damages; the punitive damage award is 63 times greater than the total compensatory verdict. Our conclusion, however, is based only in part on the disproportion between compensatory and punitive damages: other factors support it as well.

We recognize that our review of punitive damage awards is guided by the "'historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice. . . .' [Citation.]" (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927 [148 Cal.Rptr. 389, 582 P.2d 980]; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) We are also, however, "charged

with the responsibility to act if it appears that "'the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice.. .. '"" (*Zhadan* v. *Downtown L.A. Motors* (1976) 66 Cal.App.3d 481; 496 [136 Cal.Rptr. 132]; see also *Neal* v. *Farmers Ins. Exchange, supra*, at p. 928.)

Moreover, we must be guided by the well-established principle that punitive damages are not favored in law. (*Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 771 [140 Cal.Rptr. 388]; *Beck* v. *State Farm Mut. Auto. Ins. Co., supra*, 54 Cal.App.3d 347, 355.) Such damages constitute a windfall, which, though supported by law in proper cases (*Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 355 [87 Cal.Rptr. 226]), creates the anomaly of excessive compensation which makes the remedy an unappealing one. (Cf. *Wolfsen* v. *Hathaway* (1948) 32 Cal.2d 632, 647 [198 P.2d 1].)

An examination of the entire record convinces us that the $10 million punitive damage award was so improperly excessive as to demonstrate that it resulted from passion and prejudice.

Since the principal purpose of punitive damages is to deter and punish, the wealth of the defendant is always a proper consideration. (See *Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926, 937 [119 Cal.Rptr. 82].) In *Zhadan* v. *Downtown L.A. Motors, supra*, 66 Cal. App.3d at page 496, the court explained: "Likewise applicable is the principle that, the purpose of punitive damages being to punish the defendant and make an example of him, 'the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be.. . .'"
If, therefore, appellant's wealth were the only guiding factor in this case, the $10 million award might be justified, for it represents less than one-fourth of 1 percent of Sears' net assets, and only three and one-half days of its net income.[2] However, additional factors ought to have been, and were not, given the weight due them.

In *Neal* v. *Farmers Ins. Exchange, supra*, 21 Cal.3d 910 at page 928, the California Supreme Court delineated these applicable factors as follows: "In making the indicated assessment we are afforded guidance by

---

[2]Appellant complains that its net assets and income do not accurately reflect the much smaller profit it received from the Add-A-Room program. This contention ignores the obvious; punitive damages must be based upon total wealth, rather than profit from a single enterprise, if they are to achieve the desired deterrent effect.

certain established principles, all of which are grounded in the purpose and function of punitive damages. One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. (See *Bertero v. National General Corp., supra*, 13 Cal.3d 43, 65; *Fletcher v. Western National Life Ins. Co., supra*, 10 Cal.App.3d 376, 408-409 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]; *Ferraro v. Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 352-353 . . . .) Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. (But cf. *Finney v. Lockhart* (1950) 35 Cal.2d 161, 164 . . . .) Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. (See *Bertero, supra*, at p. 65; *Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 937 . . . ; *Wetherbee v. United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-271 . . . ; *Ferraro v. Pacific Fin. Corp., supra*, 8 Cal.App.3d 339, 353; *MacDonald v. Joslyn* (1969) 275 Cal.App.2d 282, 293-294 . . . .) By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter."

"A rigid formula is not involved [but] rather, a fluid process of adding or subtracting depending on the nature of the acts and the effect on the parties and the worth of the defendants." (*Walker v. Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 998 [149 Cal.Rptr. 119].)

■ A legitimate and often-reiterated factor, according to our high court in *Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d 910, is the principle that exemplary damages should bear a reasonable relation to actual damages, even though no fixed ratio exists to determine the proper proportion. (See *Liodas v. Sahadi* (1977) 19 Cal.3d 278, 284 [137 Cal.Rptr. 635, 562 P.2d 316]; *Schroeder v. Auto Driveaway Co., supra*, 11 Cal.3d 908, 922; *Forte v. Nolfi* (1972) 25 Cal.App.3d 656, 689 [102 Cal.Rptr. 455]; *Kuffel v. Seaside Oil Co., supra*, 11 Cal.App.3d 354, 367.) "A general limitation has been followed that ordinarily the punitive damages must be in some reasonable proportion to the actual damages suffered." (*Weisenburg v. Molina* (1976) 58 Cal.App.3d 478, 490 [129 Cal.Rptr. 813].)

■ When the entire record of the instant proceedings is reviewed, the requisite reasonable relationship between compensatory and punitive damages is found to be absent. Such, indeed, was the finding made by the trial court in ruling upon appellant's motion for new trial. The court, however, denied the motion for the somewhat gratuitous reason that, while perhaps excessive, the award *might* be allocated to the "unclass" of adversely affected Sears' Add-A-Room customers not before the court.[3] The trial court's finding was proper, although its speculation was not.

The disproportionate relationship here is palpable: The ratio of punitive to compensatory damages, as noted, is approximately 63 to 1; the difference in the awards is $9.85 million. Such a grossly disproportionate recovery raises a presumption that it was the result of passion or prejudice. (*Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 308 [81 Cal.Rptr. 855, 461 P.2d 39].) Thus, in *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451 [136 Cal.Rptr. 653], where the court reduced a punitive damage award from $2.5 million to $250,000—based upon a compensatory verdict of $172,325, it was concluded that: "... although there is no fixed ratio by which to determine the propriety of a punitive damage award, punitive damages should bear a reasonable relationship to the compensatory damages awarded. (E.g., *Wilkinson* v. *Singh*, 93 Cal.App. 337, 344-345 ...; *Forte* v. *Nolfi, supra*, 25 Cal. App.3d at p. 689; see also *Schroeder* v. *Auto Driveaway Co., supra*, 11 Cal.3d at p. 922; *Oakes* v. *McCarthy Co.*, 267 Cal.App.2d 231, 263 ...; 4 Witkin, Summary of Cal. Law (8th ed.) p. 3156.) Here, the ratio of punitive damages to compensatory damages is in excess of 14 to 1 and in dollar amount the punitive damage award exceeds the compensatory award by almost two and a third million dollars. [¶] We conclude that the punitive damage award is so excessive and grossly disproportionate to the wealth of defendant and to the compensatory damages awarded that it is suggestive of passion and prejudice." (*Id.*, at pp. 469-470.)

---

[3]The effect of this finding upon the scope of appellate review is unclear. In *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270 [95 Cal.Rptr. 678], the court noted: "It has been repeatedly held that after a jury award of exemplary damages, it becomes the province of the trial court on a motion for a new trial to determine whether the amount is excessive. After an award has been approved by the trial court, the reviewing court will hesitate to declare the amount excessive unless, upon a consideration of the entire record, including the evidence, it must be said that the award was excessive."

Here, the findings of the jury and trial court as to the reasonableness of the punitive damage award actually conflict. Of course, this court is still bound by the rule that the award must be overturned only upon a finding that it was the result of "passion and prejudice." The finding of the trial court lends support to such a conclusion on appeal.

Similarly, in *Allard* v. *Church of Scientology* (1976) 58 Cal.App.3d 439 [129 Cal.Rptr. 797], the reasonable relationship rule was employed to modify an excessive award. The court held: "In our view the disparity between the compensatory damages ($50,000) and the punitive damages ($250,000) suggests that animosity was the deciding factor. Our reading of the decisional authority compels us to conclude that we should reduce the punitive damages. We find $50,000 to be a reasonable amount to which the punitive damages should be reduced. We perceive this duty, and have so modified the punitive damages award not with any belief that a reviewing court more ably may perform it. Simply stated the decisional authority seems to indicate that the reviewing court should examine punitive damages and where necessary modify the amount in order to do justice. (*Cunningham* v. *Simpson*, 1 Cal.3d 301...; *Forte* v. *Nolfi*, 25 Cal.App.3d 656...; *Schroeder* v. *Auto Driveaway Company*, 11 Cal.3d 908...; *Livesey* v. *Stock*, 208 Cal. 315, 322....)" (*Id.*, at p. 453.)

The likelihood that the instant award was the result of improper considerations is heightened by the trial court's failure to submit the proposed instruction on the reasonable relationship test to which appellant was entitled. (See *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 463, fn. 4 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Wetherbee* v. *United Insurance Co. of America* (1968) 265 Cal.App.2d 921, 934 [71 Cal.Rptr. 764].) In *Wetherbee, supra*, the court found that, "the disparity between the actual damages of $1,050 and the punitive damages of $500,000 is suggestive of passion or prejudice." (*Id.*, at p. 933.) On that basis, the punitive damage award was reversed and remanded for a new trial on that issue.

Without the reasonable relationship instruction, the discretion of the jury becomes simply limitless. (*Wetherbee* v. *United Insurance Co. of America, supra*, 265 Cal.App.2d at p. 934.)

Moreover, *Neal* v. *Farmers Ins. Exchange, supra*, 21 Cal.3d 910, mandates close consideration of the nature and reprehensibility of the defendant's act. While important public policy considerations are embodied in respondents' claims—e.g., the protection of vulnerable and unwary consumers (*Zhadan* v. *Downtown L.A. Motors, supra*, 66 Cal. App.3d 481, 497; *Wetherbee* v. *United Ins. Co. of America, supra*, 18 Cal.App.3d 266, 271)—mitigating factors are likewise present. Some of the financial problems of Sears' agent/contractor, URS, could not easi-

ly have been anticipated; neither could the delay and resistance of the bonding company in performing its obligations. Further, some of appellant's actions were based upon the advice—however desultory—of counsel, and while such advice does not immunize appellant from liability, it is one factor in the overall assessment of the nature of Sears' conduct. (*Beck* v. *State Farm Mut. Auto. Ins. Co., supra*, 54 Cal.App. 3d 347, 355-356.) And, finally, the evidence indicates that appellant made some post-hoc (though feeble) efforts to rectify the situation.[4] (*Ferraro* v. *Pacific Fin. Corp., supra*, 8 Cal.App.3d 339, 354; *Luke* v. *Mercantile Acceptance Corp.* (1952) 111 Cal.App.2d 431 [244 P.2d 764].)

"The object of exemplary damages is to make the example as well as the punishment fit the offense...." (*Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270 [95 Cal.Rptr. 678]; see also *Browand* v. *Scott Lumber Co.* (1954) 125 Cal.App.2d 68, 74 [269 P.2d 891].) The $10 million verdict against appellant does not comport with that statutory objective. It is clearly excessive, not reasonably related to either the compensatory damages or the nature of appellant's conduct, and so grossly disproportionate as to be indicative of its being rooted in passion and prejudice. (*Little* v. *Stuyvesant Life Ins. Co., supra*, 67 Cal.App.3d 451, 470; *Zhadan* v. *Downtown L.A. Motors, supra*, 66 Cal.App.3d 481, 500; *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416]; *Allard* v. *Church of Scientology, supra*, 58 Cal.App.3d 439, 453; *Wetherbee* v. *United Insurance Co. of America, supra*, 265 Cal.App.2d 921, 933.)

## II

We proceed now to a consideration of appellant's contention that the compensatory damages awarded to respondents were improper, excessive, and not supported by the evidence.

Respondents' actions for fraud and breach of contract did not limit them to out-of-pocket or benefit-of-the-bargain losses. Pursuant to sec-

---

[4]The cases cited and relied upon by respondents (*Neal* v. *Farmers Ins. Exchange, supra*, 21 Cal.3d 910; and *Walker* v. *Signal Companies, Inc., supra*, 84 Cal.App.3d 982), are not controlling here. The defendant's conduct in *Neal*, was, on any objective standard, far more reprehensible, and the limited compensatory award was the fortuitous result of the death of the insured claimant. Similarly, the reprehensibility of the defendant's conduct and the lack of mitigating factors distinguish *Walker* v. *Signal Companies, Inc., supra*, 84 Cal.App.3d 982, from the present case.

tion 3333 of the Civil Code, respondents' tort claims entitled them to compensation for all detriment proximately caused by appellant's breach of obligation. (*Seaboard Music Co.* v. *Germano* (1972) 24 Cal. App.3d 618, 622 [101 Cal.Rptr. 255].) Emotional distress and mental suffering were proper elements of the compensatory damage awards under this test, as appellant's wrongdoing clearly contained elements of intentional malfeasance and bad faith. (Cf. *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Quezada* v. *Hart* (1977) 67 Cal.App.3d 754 [136 Cal.Rptr. 815]; *Kendall Yacht Corp.* v. *United California Bank* (1975) 50 Cal.App.3d 949 [123 Cal.Rptr. 848]; *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal. App.3d 917 [122 Cal.Rptr. 470]; *Windeler* v. *Scheers Jewelers* (1970) 8 Cal.App.3d 844 [88 Cal.Rptr. 39].)

The verdict awarding damages based upon a finding that appellant fraudulently represented and promised to correct deficiencies and satisfy its Add-A-Room customers was proper. As stated recently in *Allen* v. *Jones* (1980) 104 Cal.App.3d 207, 215 [163 Cal.Rptr. 445]: "[T]here is authority for the proposition that mental distress damages may be recovered in an action for deceit." (See also *Schroeder* v. *Auto Driveaway Co., supra*, 11 Cal.3d 908, 921; *Murphy* v. *Allstate Ins. Co.* (1978) 83 Cal.App.3d 38, 51 [147 Cal.Rptr. 565].)

Here, the evidence of mental suffering and other compensable injury apart from strictly out-of-pocket losses is considerable, and convincing: the awards were based on proof that Sears' conduct caused domestic disruption, frustration, anger and anxiety. The amount awarded by the jury, while substantial, does not "shock the conscience" of this court; it was well within the jury's discretion and will not be disturbed on appeal. (Cf. *Wilson* v. *Gilbert* (1972) 25 Cal.App.3d 607, 611-612 [102 Cal.Rptr. 31]; *Sherwood* v. *Rossini* (1968) 264 Cal.App.2d 926, 931-932 [71 Cal.Rptr. 1]; *Haskins* v. *Holmes* (1967) 252 Cal.App.2d 580, 584 [60 Cal.Rptr. 659].)

## III

Appellant's remaining contentions focus upon claimed errors in certain evidentiary rulings and in other jury instructions.

 The trial court's refusal to allow testimony from expert witnesses regarding appellant's reasons for securing performance by way of

performance bonds was based upon Evidence Code section 352. It is the exclusive province of the trial court to determine whether the probative value of proffered evidence is outweighed by its possible prejudicial effect, or the undue consumption of time necessary to admit it. (*People* v. *Demond* (1976) 59 Cal.App.3d 574, 586 [130 Cal.Rptr. 590].) Clearly, the trial court did not abuse its discretion in excluding such expert testimony, which was only marginally relevant, and at best repetitive and unduly time consuming. The trial court committed no error in rejecting such testimony. (*Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 339 [145 Cal.Rptr. 47].)

Appellant's contention with regard to the one alleged instructional error on the subject of fraud is simply not supported by existing case law. In *Liodas* v. *Sahadi, supra,* 19 Cal.3d 278, the California Supreme Court squarely decided, contrary to appellant's contention and requested instruction, that fraud need be proved by a "preponderance of the evidence" rather than "clear and convincing evidence." (*Id.,* at pp. 291-292.)

Additional claimed instructional errors are likewise unsupported by the evidence.

■ "As a general rule, it is improper to give an instruction which lacks support in the evidence, even if the instruction correctly states the law." (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946]; see also *Solgaard* v. *Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 370 [99 Cal.Rptr. 29, 491 P.2d 821].) Sears' requested instructions that punitive damages are improper when conduct was based upon the advice of counsel or the unratified acts of employees, were not supported by the evidence and, therefore, were properly refused.[5] Similarly, it was not error for the trial court to instruct the jury that Sears was a party to the Add-A-Room contracts, because such a legal relationship was a vital issue in the action and was conclusively established by the evidence. (*Newman* v. *First California Co.* (1975) 47 Cal.App.3d 60, 67 [120 Cal.Rptr. 494]; *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 10 [116 Cal.Rptr. 575].)

---

[5]Any advice of counsel upon which Sears based its conduct was not independent counsel, but rather officers of the corporation involved in appellant's wrongful conduct. Moreover, the alleged fraud occurred independent of the advice of counsel, thereby making Sears' requested instruction inapplicable.

Appellant's fraud consisted of making a promise and guarantee of satisfaction to its prospective Add-A-Room customers without an intention of honoring it. Nothing in the

■ Appellant also requested additional instructions—rejected by the court—first, that punitive damages could not be awarded on the basis of improper workmanship; and, second, that promissory fraud must be based upon an intent not to perform at the time the promise was made. The jury, however, was informed that punitive damages could only be assessed for conduct amounting to fraud, malice or oppression as defined by additional instructions, and was also instructed that "at the time it [Sears] made the promise, Sears must have intended not to perform it." We thus find no error in the trial court's refusal to give instructions, which were merely redundant and argumentative. (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 73 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].) Moreover, in light of the instructions given and the convincing nature of the evidence, the failure to give appellant's proposed instructions, if error, was not prejudicial. (Cal. Const., art. VI, § 13; *Thornton* v. *Luce* (1962) 209 Cal.App.2d 542, 556 [26 Cal.Rptr. 393]; *Smith* v. *Sugich Co.* (1960) 179 Cal.App.2d 299, 313 [3 Cal.Rptr. 718].)

Having concluded that the special verdicts should be affirmed, but that the amount of the punitive damage award is excessive, we may properly avail ourselves of one of several alternate dispositions. (See *Cunningham* v. *Simpson* (1969) 1 Cal.3d 301, 310 [81 Cal.Rptr. 855, 461 P.2d 39].) It appears that justice will be best served by vacating the amount of the punitive damages award, and remanding the case for a new trial on that issue only, unless respondents shall, within 30 days from the date of the remittitur, file with the clerk of this court, and serve upon appellant, a written consent to a reduction of the punitive damages award to the sum of $2.5 million, in which event the judgment will be modified to award respondents punitive damages in that amount, and as so modified affirmed in its entirety (*Little* v. *Stuyvesant Life*

---

record indicates that appellant relied on the advice of counsel in engaging in such fraudulent conduct or in attempting to insulate itself from the responsibility of performance which it had guaranteed to its customers. Rather, the advice of counsel was relevant only to Sears' conduct upon default of URS and the bonding company; conduct which was consistent with its fraudulent scheme previously devised without the assistance of counsel.

The cases relied upon by appellant—*Fox* v. *Aced* (1957) 49 Cal.2d 381, 385 [317 P.2d 608]; *Wolfsen* v. *Hathaway* (1948) 32 Cal.2d 632, 649 [198 P.2d 1]—involved fraudulent conduct which was directly based upon the advice of counsel. While, as previously noted, appellant's reliance upon the advice of its attorneys tends to mitigate the reprehensibility of its overall conduct, and for that reason constitutes a factor which favors a reduction of the punitive damage award, it was not sufficiently related to the fraud to require the jury instruction requested by appellant.

*Ins. Co., supra,* 67 Cal.App.3d 451, 471), respondents to bear the costs of this appeal.

Racanelli, P. J., concurred.

**ELKINGTON, J.**—I concur in the opinion of my respected colleagues for I find in it no error. I, as they, believe that the reduced $2.5 million punitive damage award is *authorized by existing law.*

I likewise concur in their view that the reprehensible conduct of defendant Sears, Roebuck & Company in this case is deserving of stern retribution. But I do not believe California's legislative and judicial authority to be so barren of remedial resources that retribution may be accomplished *only* by giving to plaintiffs a windfall, *to which they concededly have no right,* of more than 15 times their total compensatory damages as found by the jury.

I am fearful that the law of punitive damages as it has developed in this state no longer serves any public policy, or the legitimate interests of the unentitled recipients of its constantly accelerating largess.

I therefore express my views on the subject because of the state's announced policy that this court's criticism of existing law be brought to the attention of the public, and of legislative and higher judicial authority empowered to change it. (See rule 976(b), Cal. Rules of Court.)

No person, regardless of how grievous the circumstances, has a *"right"* to punitive damages. Such "right" as there may be, will be vindicated by the compensatory damage award designed to cover his entire loss. (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 800-801 [197 P.2d 713].)

Punitive damages are assessed only "to *punish* the defendant and not to compensate for any loss suffered by the plaintiff." (*Brewer v. Second Baptist Church, supra,* 32 Cal.2d 791, 801; italics added.) They "are inflicted in the nature of a *penalty for the evil intent.*" (*Fidelity etc. Co. v. Federal etc. Co.* (1933) 217 Cal. 307, 319 [18 P.2d 950]; italics added.)

Trial courts and juries, within the broad areas presently to be discussed have *"free" and "untrammeled" discretion* whether, or not, to

punish a defendant found by them to have such an "evil intent." (*Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d 791, 800-801.)

In order to determine how great a punishment to inflict upon a defendant he will be judicially compelled to expose to the plaintiff, to the court and jury, and to courtroom spectators, the private details of his financial holdings and affairs. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 869, pp. 3157-3158.)

In determining whether the defendant possessed an "evil intent," or should be punished therefor and if so, the severity of the punishment, the court or jury will be guided by a mere preponderance of the evidence, no matter how close to balance it may be.

And, the plaintiff having no right to punitive damages, the award has the nature of a public fine imposed to punish and deter evil intent and acts. It becomes logically indistinguishable from the fine imposed as punishment for a misdemeanor (see Pen. Code, §§ 17, 19), or for a felony where the punitive damages exceed $500 (see Pen. Code, §§ 18, 672).

Were it not for *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal. App.2d 689, 716-718 [60 Cal.Rptr. 398, 29 A.L.R.3d 988], and companion authority, holding punitive damages as permitted by our state to be constitutionally flawless, I would entertain doubt as to their due process survivability. Placing unrestricted power in a jury to direct punishment for "evil intent" by compelling the "evildoer" to pay money to another without right thereto, seems foreign to any concept of due process known to me. And such implications seem compounded by the permitted procedures, such as the preponderance of evidence test, and compulsory self-incrimination, etc.

Moreover, any judicial procedure compelling one to respond to a plaintiff's demand for full and detailed disclosure of intimate financial affairs unrelated to the action seems manifestly a contravention of article I, section 1, of the state's Constitution: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy.*" (Italics added.)

But, granting the constitutionality of the doctrine, I believe it to be contrary to the interest of the people of this state.

In California's history it had long been the rule that punitive damages were recoverable only where the defendant entertained "the wrongful *personal intention* to injure" the plaintiff (*Roth* v. *Shell Oil Co.* (1960) 185 Cal.App.2d 676, 682 [8 Cal.Rptr. 514]; italics added), and that the essential element of malice must be "*actual malice* [denoting] ill will on the part of the defendant, or his desire to do harm for the mere satisfaction of doing it" (*Gombos* v. *Ashe* (1958) 158 Cal. App.2d 517, 527 [322 P.2d 933], italics added). The penalty was inflicted, as noted, only because of the *actual* "evil intent." (*Fidelity etc. Co.* v. *Federal etc. Co., supra,* 217 Cal. 307, 319.) Such damages might not be awarded under any "*contract*" theory (Civ. Code, § 3294; *Macmorris Sales Corp.* v. *Kozak* (1968) 263 Cal.App.2d 430, 438 [69 Cal. Rptr. 719]), or under a "*negligence*" theory, no matter how "*gross*" or "*reckless*" the negligent act (*Gombos* v. *Ashe, supra,* p. 527). When properly awarded, punitive damages then had a modest relation to actual damages; "the granting of them [was] done with the greatest of caution [and they were] only allowed in the clearest of cases." (*Gombos* v. *Ashe, supra,* p. 526.)

But notwithstanding those restrictive and cautionary dicta, the bases, and frequency, and measure, of punitive damages have expanded far beyond the original legislative and judicial intent and, in my respectful opinion, far beyond reason and sound public policy.

Comparison of damage awards is often idle but here, I think, it will illustrate a point. During a selected period, 1951-1958, I find the following ratios of actual to punitive damages to have been judicially approved in this state: $2,500 to $1,000—*Ingram* v. *Higgins* (1951) 103 Cal.App.2d 287 [229 P.2d 385]; $3,525 to $1,000—*Sheward* v. *Magit* (1951) 106 Cal.App.2d 163 [234 P.2d 708]; $10,000 to $10,000—*Sullivan* v. *Matt* (1955) 130 Cal.App.2d 134 [278 P.2d 499]; $2,250 to $2,000—*Guillory* v. *Godfrey* (1955) 134 Cal.App.2d 628 [286 P.2d 474]; $740.54 to $1,500—*Austin* v. *Duggan* (1958) 162 Cal.App.2d 580 [328 P.2d 224]. During those years where actual damages of $600 were awarded, a punitive damage award of $2,500 was set aside as unreasonable. (*Luke* v. *Mercantile Acceptance Corp.* (1952) 111 Cal. App.2d 431 [244 P.2d 764].) It will be noted that the highest acceptable proportionate punitive damage award was in *Austin* v. *Duggan* where it was approximately twice as large as the actual damages found.

It was following those awards that, in December 1959, an actual damage award of $400 and punitive damages of $10,000 were judicially approved.. (*Larrick* v. *Gilloon* (1959) 176 Cal.App.2d 408 [1 Cal.Rptr. 360].) Since then the proportionate relationship of punitive to actual damages has continued to escalate, culminating perhaps in the actual damage award of $1,050 and punitive damage award of $200,000 (a ratio of 1 to 190) approved by *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266 [95 Cal.Rptr. 678] (hg. by Supreme Ct. den.).

In much the same way, the *circumstances* under which punitive damages may be awarded have been widely expanded. Although originally such damages were forbidden in actions "arising out of contract" (Civ. Code, § 3294), they are now "appropriate" and "authorized" where a "breach of contract is the basis for tort liability." (*Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 82 [154 Cal.Rptr. 43].) "The same act may be both a breach of contract and a tort," and it will be such a tort where there is "an intentional act causing injury to an interest created by the contract." (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 3, p. 2305.) Such an act "'is independent of the contract and attaches over and above the terms of the contract. This being so, the plaintiffs may treat the injury as a tort or as a breach of contract at their election.'" (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 90, pp. 960-962.) Thus, punitive damages become available, despite Civil Code section 3294, in an action "arising from contract" if its complaint "contains a count ex delicto." (*Walton* v. *Anderson* (1970) 6 Cal.App.3d 1003, 1009 [86 Cal.Rptr. 345].)

In much the same fashion punitive damages are now awardable generally in negligence actions. Where once, as pointed out, there must have been *actual* "ill will" against the plaintiff "on the part of the defendant, or his desire to do harm for the mere satisfaction of doing it," those stern requirements no longer apply. It is sufficient if there shall be found "an intention to perform an act that the actor knows, *or should know* [italics added], will very probably cause harm." (*Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 869 [118 P.2d 465]; *Nolin* v. *National Convenience Stores, Inc.* (1979) 95 Cal.App.3d 279, 286 [157 Cal.Rptr. 32].) Since it is the essence of actionable negligence that the risk of danger to the plaintiff "would have been *foreseen* [italics added] by a reasonable person" (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 496, p. 2761), it logically follows that punitive dam-

ages are now permissible in *all* negligence actions where counsel's awareness has brought about the joinder of a *"count in tort."*

These and perhaps other reasons, I think, have brought about the present-day practice of seeking punitive damages in substantially *all* damage actions, and what will reasonably be termed the explosion of punitive damage awards. And such punitive damage awards are observed not to be generally confined to large corporations such as defendant Sears Roebuck & Company, or so-called "wealthy" defendants. They are regularly returned also, against the "average" defendants of damage actions.

As we have seen, the amount of punitive damages has been entrusted to the discretion of the trial jury or court. And, as noted, that discretion has sometimes fixed the actual ratio of punitive to actual damages at 190 to 1, as in *Wetherbee* v. *United Ins. Co. of America, supra*, 18 Cal. App.3d 266, and 63 to 1, as by the jury in the case at bench. Punitive awards against less "wealthy" or "average" defendants will generally be of a narrower proportion, but often they are observed to be many times the actual damages.

Were it the effect of punitive damages to reasonably punish *only* the "evil" malefactor, or those "'who desire to do harm for the mere satisfaction of doing it'" (see *Gombos* v. *Ashe, supra*, 158 Cal.App.2d 517, 527), few would complain of the current rules. But in today's society it is a rare and fortunate person who is not at one time or another exposed to a debatably valid claim of tortious negligence, or contractual breach. In the past, where one was found in such a case to have erred, the actual damages had generally been covered by insurance and even where not, the amount was closely and foreseeably attuned to the claimant's actual monetary injury.

Insurance protects us against most of the catastrophic hazards of our existence and most important, as Justice Peters has said, it brings "peace of mind and security" into our lives. (See *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 434 [58 Cal.Rptr. 13, 426 P.2d 173].) But insurance can give no "peace of mind and security" against the ever present threat of punitive damages against any of us who, rightly or wrongly, may be found to have tortiously "breached" a contract or "negligently" injured another. Such insurance against punitive damage liability is unobtainable; it is not written by insurance companies, and it

is forbidden by law. (See *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 904-905, fn. 3 [157 Cal.Rptr. 693, 598 P.2d 854]; *City Products Corp.* v. *Globe Indemnity Co.* (1979) 88 Cal.App.3d 31, 42 [151 Cal. Rptr. 494]; 4 Witkin, Summary of Cal. Law (8th ed. 1980 supp.) Torts, § 858A, p. 375.)

Nor may a judgment for punitive damages be discharged by bankruptcy. (11 U.S.C.A. § 523(a)(6); *Tinker* v. *Colwell* (1904) 193 U.S. 473, *passim* [48 L.Ed. 754, 24 S.Ct. 505].)

Thus in a sense we, even the most prudent among us, are constantly threatened by an immovable and treacherous Sword of Damocles. For a misguided act or perhaps the misguided verdict of a jury any of us, denied the right of indemnification by insurance, is subject to possible visitation of disaster.

Such a threat in my opinion is logically intolerable, and *bad* public policy. The law's usual regard for the people's welfare, as emphasized by Justice Peters' concern for their "peace of mind and security," is seemingly abandoned.

The doctrine of punitive damages has never found favor in *equity*, the repository of the law's conscience. "'As a general rule, courts of equity will not award exemplary damages.'" (*Rivero* v. *Thomas* (1948) 86 Cal.App.2d 225, 239 [194 P.2d 533].) They "cannot be awarded in a suit in equity." (*Murphy* v. *American Motors Sales Corp.* (N.D.Ga. 1976) 410 F.Supp. 1403, 1405.) "To permit a decree for such damages would be at variance with general principles of equity jurisprudence." (*Given* v. *United Fuel Gas Co.* (1919) 84 W.Va. 301 [99 S.E. 476, 478].)

It will also be observed that the doctrine has been repudiated by many of our sister states. I cite authority of some of them:

*Connecticut.* "In this state the common-law doctrine of punitive damages…, if it ever did prevail, prevails no longer." (*Hanna* v. *Sweeney* (1906) 78 Conn. 492 [62 A. 785].)

*Massachusetts.* "Recovery of [punitive] damages [is] not permitted in Massachusetts." (*O'Reilly* v. *Curtis Publishing Co.* (D.Mass. 1940) 31 F.Supp. 364.)

*New Hampshire.* "Elements of damage do not include impositions in the nature of penalties." (*Bruton* v. *Leavitt Stores Corp.* (1935) 87 N.H. 304, 305 [179 A. 185].)

*Colorado.* "The jury may not in its verdict punish a defendant for wrongdoing." (*Larson* v. *Lindahl* (1968) 167 Colo. 409 [450 P.2d 77, 78].) "Civil actions are instituted for the purpose of redressing private wrongs; it is the aim of civil jurisprudence to mete out as nearly exact justice as possible between contending litigants. There ought to be no disposition to take from the defendant or give to the plaintiff more than equity and justice require. Yet under this rule of damages these principles are forgotten, and judicial machinery is used for the avowed purpose of giving plaintiff that to which he has no shadow of right. He recovers full compensation for the injury to his person or property; for all direct and proximate losses occasioned by the tort; . . . and then, in addition to the foregoing, he is allowed damages which are awarded as a punishment of defendant and example to others. Who will undertake to give a valid reason why plaintiff, after being fully paid for all the injury inflicted upon his property, body, reputation, and feelings, should still be compensated, above and beyond, for a wrong committed against the public at large? The idea is inconsistent with sound legal principles, and should never have found a lodgment in the law." (*Murphy* v. *Hobbs* (1884) 7 Colo. 541 [5 P. 119, 121-122].)

*Louisiana.* "It has long been the settled law in Louisiana that only compensatory damages, and not punitive damages, may be recovered in an action for tort." (*Breaux* v. *Simon* (1958) 235 La. 453 [104 So.2d 168]; and see *Janssen Catering Co.* v. *Abadie* (1924) 157 La. 357 [102 So. 428, 429]; *Trenchard* v. *Central Laundry Co.* (1923) 154 La. 1003 [98 So. 558]; *Baggett* v. *Richardson* (5th Cir. 1973) 473 F.2d 863, 865; *Bacharach* v. *F.W. Woolworth Company* (E.D.La. 1963) 212 F.Supp. 83, 85.)

*Washington.* "No citation of authority is required for the principle that Washington does not allow punitive damages." (*Conrad* v. *Lakewood General Hospital* (1966) 67 Wn.2d 934 [410 P.2d 785, 789, 10 A.L.R.3d 1].) "[T]he doctrine of punitive damages is unsound in principle." (*Maki* v. *Aluminum Building Products* (1968) 73 Wn.2d 23 [436 P.2d 186, 187].) The state's rule is based upon the following long-established rationale: "[O]ther courts have frankly stated their repugnance to the doctrine, yet considered themselves bound, by former

decisions in their respective states, to still maintain it. . . . In this state it is a new question, and the court approaches its investigation untrammeled by former decisions, free to accept the reasoning which most strongly appeals to its judgment. . . . And this desired *ultimatum*, we think, will best be attained by adopting the rule laid down by Mr. Greenleaf (volume 2, § 253) that 'damages are given as a compensation or satisfaction to the plaintiff for an injury actually sustained by him from the defendant. They should be precisely commensurate with the injury, neither more nor less; and this whether it be to his person or his estate, . . . [The doctrine] permits the jury to give what it terms "punitive," "vindictive," or "exemplary" damages; in other words, blends together the interests of society and of the aggrieved individual, and gives damages not only to recompense the sufferer, but to punish the offender.' . . . It seems to us that there are many valid objections to interjecting into a purely civil action the elements of a criminal trial, . . . While the defendant is tried for a crime, and damages awarded on the theory that he has been proven guilty of a crime, many of the time-honored rules governing the trial of criminal actions, and of the rights that have been secured to defendants in criminal actions 'from the time whereof the memory of man runneth not to the contrary,' are absolutely ignored. Under this procedure the doctrine of presumption of innocence, until proven guilty beyond a reasonable doubt, finds no lodgement in the charge of the court, but is supplanted by the rule in civil actions of a preponderance of testimony. The fallacy and unfairness of the position is made manifest when it is noted that a person can be convicted of a crime, the penalty for which is unlimited, save in the uncertain judgment of the jury, and fined to this unlimited extent for the benefit of an individual who has already been fully compensated in damages, on a smaller weight of testimony than he can be in a criminal action proper, brought for the benefit or protection of the state, where the amount of the fine is fixed and limited by law; . . . The party is fully compensated for all the injury done his person or his property, and for all losses which he may sustain by reason of the injury, in addition to recompense for physical pain, if any has been inflicted. . . . The plaintiff is made entirely whole. The bond has been paid in full. Surely the public can have no interest in exacting the pound of flesh. [¶] [W]hile jurors should be the judges of the character and weight of testimony, that judgment should be exercised under some rule, and be amenable to some law, so that an abuse of discretion could be ascertained and corrected; but, under the doctrine of punitive damages, . . . the whole question is left to the unguided judgment of the jury. . . . It seems to us that a practice which leads to so much confusion and uncertainty in the administration of the

law, and that is always liable to lead to injustice, the correction of which is impracticable, cannot be too speedily eradicated from our system of jurisprudence." (*Spokane Truck & Dray Co.* v. *Hoefer* (1891) 2 Wash. 45 [25 P. 1072, 1073-1074].)

A petition for a rehearing was denied October 29, 1980, and the petitions of plaintiffs and respondents and appellant for a hearing by the Supreme Court were denied December 10, 1980. Bird, C. J., was of the opinion that the petitions should be granted. Mosk, J., was of the opinion that the petition of plaintiffs and respondents should be granted.