[Civ. No. 59065. Second Dist., Div. Five. May 18, 1982.]

RYAN A. DINCAU, a Minor, etc., et al., Plaintiffs and Appellants, v. WALLACE A. TAMAYOSE et al., Defendants and Respondents.

**COUNSEL**

Heily, Blase & Ellison, DeWitt F. Blase and Jay H. Sorensen for Plaintiffs and Appellants.

McGahan & Engle, James F. McGahan, Mary E. Schroeder, Halde, Thomas, Kallman & Hulse, Tom Halde, Lascher & Lascher, Edward L. Lascher, Wendy Cole Lascher and Christina J. Imre for Defendants and Respondents.

**OPINION**

LAVINE, J.*—Plaintiffs, Ryan Dincau, a minor, and his parents Ronald A. Dincau and Nancy Kay Dincau, appeal from a judgment for defendants after trial by jury. The case, involving a complaint of medi-

*Assigned by the Chairperson of the Judicial Council.

cal malpractice against two doctors, concerns the events from Friday, February 22, 1975, until Monday, February 25, 1975, when it was diagnosed that the Dincau's eight-week-old baby, Ryan, had bacterial spinal meningitis.

## FACTS

Appellants' version of the evidence is that on Friday Ryan awoke in the morning with a rectal temperature of 103°F. On Friday the mother talked to defendant Doctor Tamayose's nurse, who in turn talked to Doctor Tamayose about Ryan's condition. On Saturday she talked to Doctor Tamayose. On Sunday she spoke with Doctor Tamura who was taking Doctor Tamayose's calls. On Monday she called to arrange to bring the baby into Doctor Tamayose's office, which she did that morning. At that time she insisted that the child be hospitalized. Mother's version is that in the several conversations outlined above she told the doctors and the nurses of the baby's symptoms, including a sustained temperature of over 103°, apparent discomfort and fussiness, loss of appetite, and a high-pitched cry. Mother states that in none of the contacts before Monday did either of the doctors or their employees advise that the child be seen. Prescriptions were phoned in for Tylenol on Friday and an antibiotic and a sedative on Saturday.

Appellants contended at the trial that the symptoms allegedly related by the mother to defendant doctors and the nurse—elevated temperature, irritability, appetite loss and high-pitched cry—are signs and symptoms of bacterial meningitis; that these should have led the doctors to suspect meningitis prior to Monday; and that the doctors should have examined Ryan on Friday, Saturday and Sunday rather than prescribing medication for him over the telephone which hid rather than treated the meningitis.

The expert witnesses for both sides agreed that Doctor Tamayose's conduct fell below the standard of care for a general family physician, given the facts as testified to by Ryan's mother.

Respondents' version of the evidence is that the nurse remembers talking with the mother on Friday, and that the substance of what the mother stated to her was that Ryan had a temperature of 100° rectally but that he had no other symptoms. Doctor Tamayose stated he had no memory of the telephone calls, and his charts show little other than the prescriptions phoned in. Doctor Tamayose agreed that if the mother's

report to him of Ryan's condition was correct, he should not have prescribed drugs without first seeing the child; and, given the symptoms reported by the mother, the child should have been examined. He agreed that if a new born infant is diagnosed as having meningitis the child should be treated immediately.

There was testimony that the laboratory tests given to Ryan on Monday showed no dehydration whereas there would have been some if the mother's version of his symptoms was accurate. Respondents contend that the mother's account of the child's symptoms over the crucial weekend was incompatible with the physical findings of the laboratory tests performed on Monday following the crucial weekend; and that if Ryan had suffered from a serious bacterial infection over the weekend, his white blood cell count should have been elevated and different in type, whereas it tested as normal. Comparing the Monday tests with those made seven to eight days later, experts testified that the alleged dehydration was not present; and that had the baby been dehydrated on Monday, the hematocrit level should have dropped significantly by the time of the second test. One doctor testified that the baby suffered an explosive onset of meningitis on Monday that burst into full flame after a minor infection that resembled a cold but actually may have been an infection of the ears or the throat and that the meningitis began about 1 p.m. on Monday.

It must be observed that if the jury believed that the meningitis did not begin until Monday when the baby was actually hospitalized, they could base their verdict on (a) a disbelief in the mother's account of the medical history allegedly given to the receptionist, nurse and two defendant doctors; and/or (b) a belief that the laboratory tests were at variance with the medical history of Friday, Saturday and Sunday as related by the mother.

Even if the defendants' conduct had been below acceptable medical standards, the jury may have concluded that any such negligence was not the legal cause of Ryan's later condition, if they also believed that the meningitis did not commence until Monday. Indeed, even if there had been errors in the admission or exclusion of evidence and the giving of instructions, as will be discussed below, any such alleged errors would have been harmless if the jury believed that the conduct of defendant doctors was not the legal cause of the severe injury sustained by Ryan as a result of the meningitis infection.

Alternately, if the jury disbelieved the medical history as allegedly reported by the mother, then the things allegedly done or not done by defendant doctors may not have been regarded as negligent by the jury. Hence an important (but not essential) element of the resolution of this case on appeal is whether Ryan's jury believed the testimony of the mother as to the medical history which she allegedly reported to the receptionist, nurse and defendant doctors.

Appellants do not contend that the evidence is insufficient to support the judgment, and have made no effort to set forth the evidence which supports the judgment, as would be required lest the point conclusively be deemed waived. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887-888 [160 Cal.Rptr. 516, 603 P.2d 881].) They do contend that the cumulative effect of the alleged errors were such as to mislead the jury.

DISCUSSION

A. EVIDENTIARY RULINGS

1. Admission of testimony of M. Kathleen Johnson.

Mrs. Johnson was a nurse friend of Ryan's parents, Mr. and Mrs. Dincau. She testified as to a first telephone conversation with Ryan's father around noon on Saturday during the critical weekend in which she asked the father whether Ryan had symptoms of nasal discharge, was he pulling at his ears, did he demonstrate abdominal pain, did he demonstrate colic-like pain, and did he have diarrhea. Mr. Dincau had previously been asked whether he recalled this part of the conversation and he denied recollection of this part, although he remembered the conversation itself. Mrs. Johnson also testified that the father stated that Ryan had "cold-like symptoms as Rhonda had had," and told her that he was more concerned about Andrea, the older sister of Ryan who was recovering from a tonsillectomy. The second telephone conversation with Ryan's father was three years later, shortly before the trial. In the second conversation Mrs. Johnson repeated virtually the same things that were said by her and Mr. Dincau over the telephone in the first conversation. As to each conversation, she was allowed to state not only what the father stated but also what she said.

The two telephone conversations were admitted by the trial court on the theory that they constituted prior inconsistent statements of the father. Appellants contend the conversations were not admissible as pri-

or inconsistent statements. The father's statements were consistent with his testimony, and Mrs. Johnson's statements were her own statements and not those of the father. Statements of the father if admitted as prior inconsistent statements, are admissible for the truth thereof against all parties under Evidence Code section 1235,[1] as well as constituting an attack on the father's credibility under section 1202. However, if the father's statements are admissible as admissions of a party under sections 1220-1224, the statements are not necessarily admissible against Ryan, as is discussed *infra*. Section 1220 carries the limitations that "[e]vidence of a statement is not made inadmissible by the hearsay rule *when offered against the declarant* in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity." (Italics added.)

For the purpose of analysis, let us divide the conversations into three parts:

a. What father said to Mrs. Johnson in the first telephone conversation.

Admissibility as against the father.

(1) Father's statements constitute an admission of a party under section 1220 and these are clearly admissible as against the father. The trial court admitted the statements primarily on the theory of inconsistent statements, but for purposes of appeal there is no error if the testimony is admissible under any basis. (See *Kinney* v. *County of Contra Costa* (1970) 8 Cal.App.3d 761, 771 [87 Cal.Rptr. 638].)

(2) Similarly father's statements are also admissible against the father under section 1224 as statement of a declarant whose liability or breach of duty is in issue (since it is contended that the father and mother were contributorily negligent).

(3) These are also inconsistent statements of a witness under section 1235, and admissible under the theory followed by the trial court. Appellants argue that the father's testimony concerning the content of his telephone conversations with Mrs. Smith was essentially "I don't know,"

---

[1]All section references are to the California Evidence Code unless otherwise specifically designated.

and that there can be no admission of inconsistent statements if the witness is completely unable to remember, citing *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700]. However, father's lack of recollection may not be expressed that simply, as he did remember portions of the conversation. Even if we accept appellants' contention that Mr. Dincau had no recollection of this portion of the conversation, the point is governed by *People* v. *O'Quinn* (1980) 109 Cal.App.3d 219 [167 Cal.Rptr. 141], wherein the court held that a deliberately evasive "I don't remember" constitutes an implied denial, and opens up the case to presentation of evidence of inconsistent statements. (3A Wigmore, Evidence, (Chadbourn, rev. ed. 1970) § 1043, p. 1061.)

Appellants are critical of the California rule permitting inconsistent statements under section 770. They argue that under the Federal Rules of Evidence, rule 801(d)(1)(a), the prior inconsistent statement of Mr. Dincau would not have been permitted since it was not given under oath on the prior occasion. Although it is sufficient to state that the California Legislature has adopted a different rule of evidence in section 770 than that later placed in the Federal Rules of Evidence, rule 801 by United States House of Representatives, appellants' reliance on what they regard as the preferable federal rule is misplaced. Under Federal rule 801(d)(2) the father's statements would not have been hearsay as that rule provides that a statement is not hearsay if it is offered against a party and is (a) his own statement, in either his individual or representative capacity, or (b) a statement of which he has manifested his adoption or belief in its truth, or (c) a statement by a person authorized by him to make a statement concerning the subject.

Admissibility as against the mother.

The father testified that during the weekend while the mother took care of Ryan, the father took care of the other things that had to be done, including care of the other children. Besides their relationships of husband and wife and mother and father, that weekend a special relationship existed between the two—that of a team trying to take care of their sick children. Therefore, it can be said that statements made by the father to the nurse friend in an endeavor to get further help and advice constituted authorized statements with respect to helping the sick Ryan, admissible against the mother under section 1222.

Admissibility as against Ryan.

The main thrust of appellants' argument is that statements of father were not admissible as against Ryan. By way of dictum it can be argued that the statements made by father to a nurse friend in an endeavor to get advice about Ryan might be considered authorized as a matter of law. (See, Witkin, Cal. Evidence (2d ed. 1966) § 518(c); § 1222, Law Revision Com. com.; Civ. Code, §§ 2319-2320; Rest.2d Agency, § 47.) Obviously an eight-week-old infant does not in fact authorize his parents to speak for him. But the child cannot speak for himself and requires the aid of his parents in speaking for him—as in giving his medical history to a nurse or a doctor in order to aid him.[2] Can the infant reap the advantages of having his parents speak for him to a doctor or nurse, and then not permit such statements to be used against him in a courtroom?

Even if there is no authorized admission under section 1222 as to Ryan, since the statements were admissible as prior inconsistent statements under section 1235 they were admissible for all purposes. Even if this were not so, there was no error because no request for a limiting instruction was made under section 355 which provides: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for other purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.) ■ Even if an objection is made, a limiting instruction must be requested. (*People* v. *Guy* (1980) 107 Cal. App.3d 593, 602 [165 Cal.Rptr. 463]; *Rupp* v. *Summerfield* (1958) 161 Cal.App.2d 657, 662-663 [326 P.2d 912]; Witkin, Cal. Evidence (2d ed. 1966) § 1295.)

■ Appellants urge that even if father's statements are admissible as inconsistent statements, then surely the statements which Mrs. Johnson made to father are not admissible as falling in that category. But in order to understand father's inconsistent statements it is necessary to consider the whole conversation which Mrs. Johnson relates concerning the condition of and suggestions made as to Ryan coupled with father's replies.

Not only were Mrs. Johnson's statements admissible on the basis of section 770 inconsistent statements, they were also admissible as section

---

[2]An analagous situation is the exception to the psychotherapist-patient privilege where the patient is a child under 16 years who is the victim of a crime and the disclosure is in the best interest of the child. (§ 1027, subd. (b); *In re Courtney S.* (1982) 130 Cal.App.3d 567, 574-575 [181 Cal.Rptr. 843].)

1221 adoptive admissions," . . . if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

Statements made by Mrs. Johnson to father, as an adoptive admission by father, would constitute an authorized admission as to the mother with respect to their weekend "joint enterprise" in caring for Ryan. The problem of admissibility as to Ryan is more difficult, as discussed above. But here there was failure by appellants to ask for a limiting instruction, so the error, if any, is waived.

The second telephone conversation which occurred three years later, is admissible as against the father under either the inconsistent statement basis or as a section 1220 admission of a party, and a section 1221 adoptive admission as to statements made by Mrs. Johnson to father. We need not consider whether the second telephone conversation was admissible as against the mother (who apparently made no objection) or Ryan; as the error, if any, was waived by appellants' failure to seek a limiting instruction.

Let us consider Mrs. Johnson's testimony in context. We agree with appellants' contention that her evidence was critical. Here we have a mother and father who are laypersons relating what they told to nurses, a receptionist and doctors over the telephone during the critical weekend. The trial court and jury only hear the mother's version of what she told the doctors, their nurses and receptionist. The doctors lack sufficient recollection to tell their side of the events, and their records do not supply the missing link. Along comes a nurse who is a friend of the father and mother and thus has no inherent bias or conflict of interest. She does remember what father stated was Ryan's condition, and what her replies were. This testimony is highly relevant to a jury's search for truth. If a section 352 objection had been made, undoubtedly the trial judge would and should have rejected such objection because of the high degree of relevance of Mrs. Johnson's testimony and its capacity to clarify things for the jury.

Because she is a nurse she would have been able to understand the significance of, and thus remember better than the father, the statements made by the latter to her during the critical weekend, including the father's answers to her queries concerning the symptoms demonstrated by Ryan. Undoubtedly the trial court regarded her testimony as

being plausible and thus would have had no inclincation to keep it out, provided it met the qualifications of the Evidence Code. The jury believed her testimony, as demonstrated by their verdict.

Eminent authorities regard the hearsay rule as being designed so that the better evidence in the form of testimony under oath is brought before the trier of fact and so that evidence admitted for its truth may be subject to cross-examination, unless there are other sufficient indicia of reliability (in the form of hearsay exceptions). (McCormick, Evidence (2d ed. 1972) pars. 245-246; 5 Wigmore on Evidence (3d ed. 1940) § 1362.) Such authorities would regard Mrs. Johnson's testimony as being admissible hearsay (whether or not linked to father's statements) since, although consisting of extrajudicial statements, she was available for cross-examination. Also the father, who was the other party to the conversation, was available for cross-examination. Since the best available testimony was proffered, and it met the California evidentiary rules set forth by the Legislature, we should not be inherently suspicious of Mrs. Johnson's testimony or strive to consider it inadmissible.

2. Admission of habit and custom evidence as to Doctor Tamayose and his staff.

█ Appellants object to admission of evidence of the habit and custom of Doctor Tamayose and his staff as to their habitual response to telephone calls about minors' conditions, including the doctor's habit and instructions and usage thereon about (a) requesting that a child be brought in if its temperature is over 100°; (b) giving of prescriptions over the telephone; and (c) contacting Doctor Tamayose (or his stand-in Doctor Tamura) if certain conditions were described by the caller.

Appellants urge that such testimony was inadmissible as falling under section 1104 which makes evidence of a trait of a person's character inadmissible to prove the quality of his conduct on a specified occasion. Although the line between section 1104 and section 1105 may sometimes be a thin one, the nature and quality of the evidence objected to here clearly fell under section 1105 which permits introduction of evidence of habit or custom to prove conduct on a specified occasion in conformity with the habit or custom. (Jefferson, Cal. Evidence Benchbook (1972) § 33.6; Witkin, Cal. Evidence (2d ed. 1966) §§ 336-338, see Cal. cases cited therein; and 2 Weinstein, Evidence (1981) par. 406[02].)

Appellants object that the trial judge should have made a preliminary determination of the existence or nonexistence of the habit or custom under section 405, subdivision (a). Appellant does not cite us to any portion of this voluminous record where such request for an *in limine* motion was made. Even if it had been requested, the trial court's failure to grant an *in camera* hearing would be harmless error, since the trial court correctly allowed such evidence of habit and custom to be introduced before the jury.

It is further asserted that habit and custom should not be used to establish lack of negligence. In California such evidence can be used to show due care on a particular occasion. (Witkin, Cal. Evidence (2d ed. 1966) § 338; *Romeo* v. *Jumbo Market* (1967) 247 Cal.App.2d 817, 823 [56 Cal.Rptr. 26].) Appellants contend that the habit and custom evidence was introduced not to show what happened on a particular occasion, but rather to show that mother was not telling the truth or was mistaken about the telephone conversations she related as having taken place. We disagree. Evidence of custom may be introduced to show that it was unlikely that a defendant was negligent on a particular occasion. In the case at bar, if Doctor Tamayose and his staff habitually asked that an infant with a temperature of more than 100° be brought in for an examination, and did not prescribe over the telephone under such circumstances, this renders it less likely that Doctor Tamayose was negligent and more likely that he used care during the critical weekend. As an incidental effect, such habit evidence also tend to prove that it was less likely that the mother reported the telephone conversation correctly, and thus tends to be impeaching evidence against mother. But such incidental effects should not render habit evidence inadmissible. If we consider such habit evidence from the standpoint of section 352, the evidence is greatly relevant, and tends to help the jury in determining what actually happened over the weekend rather than confusing them.

Appellants contend that the trial court should not have permitted Doctor Tamayose's nurse to testify concerning telephone conversations with other parents reporting about sick children to show the habit of the office. Such telephone conversations are admitted not for the truth of what was said at either end of the telephone, but to prove that such telephone conversations habitually were made from Doctor Tamayose's office by his receptionist and nurse. They corroborate the existence of the habit and usage in that office.

It is further urged that habit and custom evidence should not have been permitted to be given by the receptionist and nurse since they were able to remember the particular conversations with the mother, more particularly the Friday call, and could be considered "eye witnesses." The California rule formerly excluded habit evidence where there were eyewitnesses to an accident. That "eye witness" limitation was abrogated by the Evidence Code in section 1105. The main thrust of plaintiffs' case was to show that defendant doctors were negligent, and that Doctor Tamayose did not have any specific recollection of the details of his telephone conversation. The effect of the recollection of nurse and receptionist together with evidence of habit and custom is to bolster defendants' contention of nonnegligence.

Appellants further argue that evidence of habit and usage is irrelevant since Doctor Tamayose did not act in accordance with his habit and custom on this particular occasion. This is putting the cart before the horse, for it is true only if the jury should accept the mother's version of the medical history she allegedly transmitted to Doctor Tamayose and his staff. If we accept appellants' theory, then the trial judge would have to accept the latters' version of the evidence and rule out habit and usage, regardless of other evidence. We cannot accept that argument for it is a factual question for the jury as to whether Doctor Tamayose acted according to his habit.

Let us carry appellants' argument to its farthest extent. Let us suppose that Ryan would wait the full period of time after the meningitis permitted by Code of Civil Procedure section 340.5 and sue Doctor Tamayose or any other doctor; and to support his case would bring in the testimony of his mother, supposedly stating she talked to Doctor Tamayose (or any other doctor), who then supposedly stated to her "I never see sick children over a weekend, no matter how sick they are, or how high may be their temperatures!" What protection would any doctor have, years after an event, other than a vigorous denial that the event did or could have taken place, together with perhaps a lack of recollection of ever having talked to the mother? A rule of reason would demand, and the California Evidence Code provides, protection to such a doctor by allowing him to show the trier of fact that such a tale is contrary to his habit and custom, and that therefore he was not negligent at the time in question. (Wigmore, Evidence (3d ed. 1940) § 98.)

■ Objection is made to evidence of habit and custom after February 21, 1975. Such later events are not excludable per se if sufficiently

related in time and characteristics to the time and nature of the injury. (McCormick, Evidence (2d ed. 1972) § 195; Witkin, Cal. Evidence (2d ed. 1966) § 338(a).) Appellants may be contending that Evidence Code section 1151 applies which makes inadmissible remedial or precautionary measures taken, after occurrence of an event, in order to prove negligence or culpable conduct in connection with the event. Section 1151 is not applicable here as we are not concerned with after-the-event remedial or precautionary measures, nor are these events used to prove negligence or culpable conduct, but rather the reverse. For if the subsequent events are offered to prove anything other than negligence or culpable conduct, they are admissible if relevant. (Witkin, Cal. Evidence (2d ed. 1966) § 385(b); *Wilson* v. *Gilbert* (1972) 25 Cal.App.3d 607, 615 [102 Cal.Rptr. 31], in which evidence was held admissible to show that defendant doctor's subsequent training in giving arteriograms and changing referral practice).

3. Mother's telephone conversation on Friday afternoon.

■ The court received evidence of mother's Friday telephone call to the nurse and receptionist subject to a limiting instruction that it was not received for its truth. The judge's ruling was correct.

Appellants argue that the trial court erred in limiting the mother's testimony about her Friday telephone call to Doctor Tamayose's office by ruling it was not received for the truth of the matters stated therein. In fact appellant's counsel offered the testimony only "to establish the conversation took place." The mother's statements were as to the child's symptoms—she had already testified as a percipient witness to those matters. She did not need a hearsay statement to establish them. The only significance of the nurse's reply was the fact that the statements were made. The nurse told Mrs. Dincau that a rectal temperature was one degree higher than an oral temperature, that she would order a prescription for liquid aspirin and that if Ryan's temperature went higher to give the baby cool baths and that the doctor would "call in a prescription." Other evidence established that a prescription for liquid aspirin was called in to a pharmacy for Ryan and that later Doctor Tamayose called in a second prescription for an antibiotic and sedative. Since appellant's counsel expressly offered the Friday conversation not for the truth of the matter, but rather to establish that the conversation took place, appellant cannot now be heard to complain about the court's limitation on that evidence.

BAJI No. 2.43 (which will be discussed *infra* in its modified form) covers this subject well. It permits a jury to consider testimony by a physician of statements made to him by a patient for the purpose of diagnosis or treatment not to show the truth of the facts stated but to show the information upon which the physician based his opinions. In this instance the medical history was being transmitted to Doctor Tamayose through his nurse and receptionist.

4. Testimony of babysitter as to prior consistent statements of mother.

The babysitter was asked whether, during any conversation with the mother over the weekend, she heard Doctor Tamura's name mentioned. She said she did hear the name mentioned, but a hearsay objection was sustained as to the content of any such statements heard by her. An offer of proof was made that the babysitter would testify that she had a conversation with the mother who told her that she had talked to Doctor Tamura and that he said he had not seen Ryan because he did not believe it was necessary.

Appellants did not show any foundation that there had been any prior inconsistent statement by Mrs. Dincau.

To be admissible as a consistent statement under sections 791 and 1236, the statement must have been made before the alleged inconsistent statement; or there must be an express or implied charge that the testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and that the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen. There is no showing here of any inconsistent statement by the mother. Nor is it more than arguable that there was an express or implied charge of recent fabrication as to what she told Doctor Tamura. There is such a charge as to what a Doctor Bamman told Mrs. Dincau but not as to Doctor Tamura. Let us analyze what this charge of recent fabrication amounts to. It does *not* consist of an offer of proof that mother had stated to babysitter that she had told Doctor Tamura that Ryan had a temperature of 100°, followed by Doctor Tamura's supposed reply that he did not think Ryan was sick enough to be seen by him. Rather the offer is merely that the babysitter would have related that mother stated that Doctor Tamura did not think Ryan was sick enough to be seen by him, with no mention of any temperature over 100°. If the babysitter had been allowed to testify to the conversation in

accordance with the offer of proof, such testimony would have been consistent with defendants' evidence of habit and custom, and their theory of nonnegligence. Hence the error, if any, in refusing the admission of the hearsay conversation was not prejudicial to appellants.

5. Errors as to hypothetical questions.

Two expert witnesses were asked certain hypothetical questions on cross-examination, and were asked to assume (a) that the day before, Ryan's sister Rhonda was demonstrating symptoms of a cold; and (b) that an appointment with Doctor Tamayose was offered the mother but that she declined. On the basis of this hypothetical question each of the experts testified that Doctor Tamayose's conduct did not fall below the standard of care.

Appellants claim no evidence supports the hypothetical question asked of the expert witnesses. The record contains evidentiary support for both hypotheses:

(a) "Q. By Mr. McGahan: Yes. You told Mr. Dincau that you were surprised that Dr. Tamayose would call in a prescription for a young child, and you asked Mr. Dincau what symptoms Ryan was having when you made that inquiry of him. What did Mr. Dincau say to you? A. [By Mrs. Johnson] He said that Ryan *was having cold-like symptoms as Rhonda had had.*" (Italics added.)

(b) Also, there is basis in the record for hypothesis (b), namely that an appointment was offered to the mother. "The Witness [receptionist]: Mrs. Dincau called the office, [*sic*] I answered the telephone. Mrs. Dincau identified herself, stated that the child was ill with a temperature and pulling at his right ear. *I suggested she bring the child in to the office right away.*

" . . . . . . . . . . . . . .

"Q. By Mr. McGahan: When you made the suggestion, Mrs. Conn, that Mrs. Dincau bring the baby in right away, was the baby brought into the office? A. No." (Italics added.)

█ Not only is there a sufficient basis for the two hypotheses questioned by appellants, but this occurred on cross-examination of experts proffered by plaintiffs. A wide latitude should be allowed cross-

examination of expert witnesses. (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 796 [174 Cal.Rptr. 348]; *Brown* v. *Alfonso* (1960) 185 Cal.App.2d 235, 238 [8 Cal.Rptr. 156].) Surely on cross-examination of experts hypothetical questions which are fair in scope and fairly relate to the state of the evidence in the case may test the credibility of the experts as well as test the validity of hypothetical questions and answers given by the experts in their testimony in chief. Such cross-examination tends to clarify the inherent vice of lengthy and confusing hypothetical questions put on direct examination. (See *Estate of Dolbeer* (1906) 149 Cal. 227, 243 [86 P. 695]; Witkin, Cal. Evidence (2d ed. 1966) § 1179.)

Similar but amplified hypothetical questions were asked of two other expert witnesses, namely Doctors Shaw and Holderman, proffered by defendant Doctor Tamayose. Since no objection was made by appellants to such hypothetical questions at the time, any alleged objections, except as to relevancy, are waived. That the questions are relevant is apparent from the discussion above.

## B. JURY INSTRUCTIONS

### 1. BAJI No. 3.16

Although it is urged that this instruction is improper, all counsel at one point in the trial stipulated that it be given. Even if it is deemed excepted to under Code of Civil Procedure section 647 as an instruction offered by one's opponent, the instruction is a clear statement of the law which seems to be applicable to this case. ■ Since evidence of habit and custom was properly introduced, as discussed *ante*, the jury was entitled to an instruction that they had a right to consider such evidence, but that it is not necessarily controlling on the issue of ordinary care. Although the Use Note refers the user to BAJI No. 3.10 (which should not be used in a medical malpractice case, (*Putensen* v. *Clay Adams Inc.* (1970) 12 Cal.App.3d 1062 [91 Cal.Rptr. 319])) there is no reason why BAJI No. 3.16 should not be used in a medical malpractice case.

### 2. BAJI No. 2.43 (modified).

Appellants object to BAJI No. 2.43 (modified) which was given in the parents' set of instructions, but not as to Ryan where the full BAJI

No. 2.43 was read. The modified form reads: "Testimony by a physician of statements made to him by a parent of a minor patient for the purpose of diagnosis or treatment may be considered by you not to show the truth of the facts stated, but to show the information upon which the physician based his opinions; except any statement made by such parent which constituted an admission of a fact or facts adverse to such parent's interest may be considered by you as evidence of the truth of the matter stated."

 It is contended that there was no testimony of the doctors to statements made by the parents upon which a diagnosis was based. We do not agree. The mother made statements to the receptionist, nurse and to the doctor defendants. Upon the basis of the medical history furnished the doctor defendants made certain judgment calls. These may be considered as being a "diagnosis" in the sense that each of the doctors determined upon such medical history furnished what they would do or advise be done or not done. Hence the instruction was proper and helpful to the jury in considering where the medical history fitted in the case.

3. BAJI No. 6.02 (modified).

The modified form, objected to by plaintiffs states: "A physician and surgeon is not necessarily negligent merely because his efforts were unsuccessful or he makes a mistake or error in judgment in the matter for which he is engaged. This is to direct your attention in this regard to the instructions I gave you wherein I defined what negligence is so far as a physician is concerned.

"However, if the physician and surgeon was negligent as defined in these instructions, it is not a defense that he did the best he could."

 This instruction is appropriate as it tells the jury that they do not necessarily adjudge whether there was negligence in terms of the result achieved, but should also consider other factors as set forth in the other negligence instructions. Considered in the opposite way, defendants could have been considered negligent by the jury even had the treatment of Ryan for meningitis on Monday been completely successful with little or no damages suffered.

4. Defendants' Special B (second revision).

"The following instruction is given to you for whatever assistance you conclude it may provide, if any, in evaluating whether or not Mr. or Mrs. Dincau had an interest as they respectively testified as witnesses in this action. It must not be considered by you for any other purpose.

"A minor plaintiff would not be competent to execute a will until he reaches the age of 18 years. Even after reaching the age of 18 years a person is not competent to execute a will unless he has the mental capacity:

"(1) To understand the nature of his act in executing a will, and

"(2) To understand and recollect the nature and situation of his property, and

"(3) To remember and understand his relations to the persons who normally would be thought about by a person making a will.

"Upon the death of a person who has no will, or no valid will, who has no spouse or child, such person's entire estate passes to his parents in equal shares, or if either of them is dead, the entirety to the surviving parent.

"Of course this instruction has no bearing on the existence of an interest unless you conclude from all of the evidence, with any reasonable inferences that may be drawn therefrom, that Mr. or Mrs. Dincau respectively knew of the prospect that they might inherit from Ryan's estate at the time that he or she was testifying.

"I, of course, express no view of my own whatever on the credibility of Mr. or Mrs. Dincau nor on the question of what weight should be given to their respective testimony."

■ This instruction is a correct statement of the law, but appellants contend that it singles out particular witnesses, rather than witnesses as a whole—a practice criticized by cases of some years ago, namely *Juchert* v. *Tenent* (1932) 126 Cal.App. 216 [14 P.2d 617]; *Blackwell* v. *American Film Co.* (1920) 48 Cal.App. 682 [192 P. 189] and *County of San Mateo* v. *Christen* (1937) 22 Cal.App.2d 375 [71 P.2d 88].

It is interesting to note that two of the cases cited were written prior to the 1934 addition of article VI, section 19 of the California Constitution (presently art. VI, § 10): "... The court may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." Therefore we regard the constitutional amendment as controlling. Of course any comment by the court must be fair. (*People* v. *Oliver* (1975) 46 Cal.App.3d 747, 753 [120 Cal.Rptr. 368].) Here the instruction of the court was fair, and did not really constitute "comment" in the strict sense of the word.

Appellants do not contend that the evidence is insufficient to support the verdict and judgment but claim that the cumulative effect of the errors was such that it is reasonably probable that a result more favorable to appellants would have been reached in the absence of error. Even if there were some error in this lengthy trial, in which the record consumes 96 volumes of reporter's transcript and 12 of clerk's transcript, the alleged errors would be slight indeed considering the length and complexity of the trial.

In light of this disposition of the appeal, the petitions for writ of supersedeas filed herein on December 14, 1981, and April 12, 1982, are hereby denied, and the judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied June 17, 1982, and appellants' petition for a hearing by the Supreme Court was denied July 22, 1982. Kaus, J., did not participate therein.