Filed 9/18/14  Powers v. Yaski CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ED POWERS,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>RICHARD YASKI et al.,<br><br>      Defendants and Respondents. | A139957<br><br>(Mendocino County<br>Super. Ct. No. SCTM CVG 11-58743) |

Plaintiff Ed Powers appeals from a judgment upholding the right of defendant Richard Yaski, aided by defendant Prime Pacific, to foreclose on real property that secured plaintiff's indebtedness to Yaski. Plaintiff makes a multitude of contentions, including that (1) the notice of default was defective; (2) the trustee breached its duties in failing to verify the amount in default; and (3) the promissory note securing the deed of trust was tainted with usury because it was a renewal of prior notes charging excessive interest. Trial was bifurcated between equitable and legal issues and a bench trial of the equitable issues resulted in findings that effectively disposed of the legal claims. Plaintiff also raises several procedural issues concerning trial bifurcation and witness examination. We find no merit in plaintiff's substantive or procedural contentions and shall affirm the judgment.

**Statement of Facts**

Plaintiff is a rural real estate developer. On multiple occasions beginning in 1977 he has purchased parcels of undeveloped land, built a house in which he and his wife have resided, and then sold the improved property for a profit.

In 2002, plaintiff acquired for development 265 acres of harvested timberland in Caspar, California on the Mendocino coast (Caspar property). The purchase price was approximately $685,000. Plaintiff approached his "good friend" and neighbor Richard Yaski to obtain financing for the balance of the purchase price over the $400,000 that plaintiff invested from his own funds. Plaintiff testified he was "not sure" he could have obtained financing from a bank and believed private financing "would be good for both of us."

In December 2002, plaintiff executed a promissory note for $375,000 payable to Yaski and secured by a deed of trust on the Caspar property. Interest was set at 8 percent, which was the rate proposed by plaintiff based on then-current bank rates. Over the following years, plaintiff obtained a series of additional loans from Yaski to develop the property, each secured by a deed of trust. Plaintiff explained that he borrowed in incremental amounts because development costs were uncertain and he did not want to borrow more than needed. By 2006, plaintiff had borrowed a total of $1.2 million at interest rates varying from 8 percent to 12.5 percent.

In September 2006, the parties consolidated the prior loans by executing a single promissory note for $1.2 million and cancelling all prior notes. Interest was stated to be 8 percent on $545,000, 10 percent on $450,000, and 12.5 percent on $205,000. An accountant testified that the effective annual rate of interest on the entire principal was 9.52 percent.

In November 2007, plaintiff sold 100 acres of the Caspar property and applied $400,000 from the sale proceeds to reduce his $1.2 million debt. In April 2009, the parties cancelled the 2006 note and executed a new promissory note for $800,000, with interest rates stated to be 8 percent on $545,000 and 10 percent on $255,000. The effective interest rate on this note is 8.64 percent. The note was secured by a deed of trust on the Caspar property and required plaintiff to make interest-only monthly payments with balloon payments of principal in October 2009 and April 2010. In October 2009, the parties modified the note to defer all principal payments until April 2010, which plaintiff could extend until October 2010.

Plaintiff failed to make the required interest payments. In July 2010, Yaski initiated nonjudicial foreclosure proceedings on the Caspar property under the April 2009 promissory note and deed of trust. He hired Prime Pacific, a professional trustee, which recorded a notice of default on July 30, 2010. The notice advised plaintiff he was $40,421 in default on his payments. In November 2010, plaintiff filed chapter 12 bankruptcy proceedings, which halted the scheduled foreclosure sale. Months later, the bankruptcy court found plaintiff ineligible for protection under chapter 12 and dismissed his petition. A trustee sale of the Caspar property was set for August 15, 2011.

On August 11, 2011, four days before the scheduled trustee sale, plaintiff filed the instant action against Yaski and Prime Pacific. Plaintiff maintained he was not in default on the loan and that the notice of default was "wrongfully recorded" because Yaski charged usurious interest in excess of 10 percent and "failed to account for and deduct from the principal due the total amount of usurious interest payments." Although the interest rate on the loan foreclosed upon did not exceed 10 percent, plaintiff alleged the loan was "tainted" by prior loans exceeding the legal rate that were "rolled into" the current promissory note.

A subsequent amended complaint stated 10 causes of action: (1) declaratory relief as to parties' "respective rights and duties" and, specifically, plaintiff's entitlement to a credit for the payment of usurious interest, (2) injunctive relief to restrain sale of the property, (3) an accounting by defendants of all loan transactions, (4) declaratory relief concerning "recovery of usurious interest," (5) breach of contract in charging excessive interest and fees, (6) negligence in "servicing" the loan including "crediting of payments," (7) wrongful foreclosure, (8) breach of the implied covenant of good faith and fair dealing, (9) unjust enrichment, and (10) slander of title.

Plaintiff's request for a preliminary injunction was denied in December 2011. In July 2012, with an appeal from the denial pending, Yaski agreed "to withhold all foreclosure proceedings through the conclusion of trial," in exchange for which plaintiff "withdrew his request for . . . extraordinary relief." In August 2012, this court dismissed

3

as moot the appeal from the order denying a preliminary injunction. (*Powers v. Yaski* (Aug. 17, 2012, A134578) [nonpub. opn.].)

In February 2013, Yaski moved to bifurcate trial with equitable issues determined in a bench trial before a jury trial of any remaining legal issues. (Code Civ. Proc., §§ 598, 1048, subd. (b).) Plaintiff opposed the motion and suggested that appointment of an independent expert accountant or court referee in advance of trial would be appropriate. The court granted the motion to bifurcate and ordered a first stage bench trial on equitable issues presented in plaintiff' first four causes of action: "1. Declaratory relief/Accounting; 2. Injunctive relief; 3. Accounting; and 4. Declaratory relief/Recovery of Usurious Interest."

A six-day bench trial was held in June and July 2013. Six witnesses testified, including plaintiff, Yaski and Joan Sturges, an accountant who testified as Yaski's expert witness. Plaintiff retained an accountant but ultimately proceeded to trial without an expert. Both parties were represented by counsel until the last day of trial, when plaintiff dismissed his attorney and undertook his own representation.

The court announced its decision at the close of evidence and directed defense counsel to prepare a written judgment consistent with the court's decision. Plaintiff later requested a statement of decision, which the court filed in August 2013. The court rejected plaintiff's claim of usury, with a minor exception adopted the accounting of loan transactions provided by Yaski's expert witness, and concluded that plaintiff owes Yaski $1,028,903 under the April 2009 promissory note. The court's findings resolved all issues in the litigation, obviating the need for a jury trial. The court entered judgment for defendants and plaintiff timely filed notice of appeal.

## Discussion

Plaintiff raises numerous claims of error, both procedural and substantive. We address each claim in the order presented in his appellate brief.

*Trial bifurcation was proper and not a denial of due process.*

Plaintiff argues he was denied his right to a jury trial and due process by the court's bifurcation of trial and resolution of equitable claims in a bench trial that proved dispositive of all remaining claims. The argument is unavailing. "It is well established in California jurisprudence that '[t]he court may decide . . . equitable issues first, and this decision may result in factual and legal findings that effectively dispose of the legal claims.' " (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 157.) Plaintiff sought an accounting of the loan transactions upon allegations that Yaski charged usurious interest. "A cause of action for an accounting is an equitable proceeding to which no right to jury trial attaches." (*De Guere v. Universal City Studios, Inc.* (1997) 56 Cal.App.4th 482, 507.) The court properly ordered trial of the equitable accounting claim before legal claims, as it is " 'better practice' . . . for 'the trial court [to] determine the equitable issues before submitting the legal ones to a jury." (*Hoopes, supra,* at p. 157.) The court also properly concluded that trial of the equitable issues dispensed with the legal issues. The court's findings on the accounting cause of action—establishing that plaintiff defaulted on his loan payments and was not charged usurious interest—refuted his remaining causes of action for breach of contract, wrongful foreclosure and related claims.

*The trial court did not abuse its discretion in determining accounting issues without appointing an independent expert.*

Plaintiff maintains the court should have appointed an independent expert accountant or court referee to settle the accounting issues and erred in accepting the testimony of Yaski's accountant expert. As a preliminary matter, a mortgagor like plaintiff generally has no right to seek an accounting from a loan servicer as to the amount he owes. A mortgagor "as the party owing money, not the party owed money, has no right to seek an accounting" under California law. (*Quinteros v. Aurora Loan Services* (E.D. Cal. 2010) 740 F.Supp.2d 1163, 1170.) However, the action here raised more issues than the amount owed because plaintiff claimed the loan was usurious; resolution of that

5

claim required an accounting. Plaintiff is mistaken in asserting the court was required to appoint an independent expert or court referee to settle the account.

A trial court is not required to appoint an expert to render an accounting but may itself "take or state the account" upon evidence presented. (*Emery v. Mason* (1888) 75 Cal. 222, 225.) "Section 639 of our Code of Civil Procedure provides that the trial court in certain cases may appoint a referee for the taking of an accounting, but there is nothing in said section, or in any decision of our appellate courts, which makes it mandatory for the court to order such reference." (*Berkowitz v. Kiener Co.* (1940) 37 Cal.App.2d 419, 426.) It is "a matter entirely within the discretion of the trial court to determine whether it [is] necessary to refer the accounting to an accountant." (*Walsh v. Jack Rubin & Sons, Inc.* (1960) 182 Cal.App.2d 652, 654.) No abuse of discretion appears here.

*The trial court did not abuse its discretion in sustaining objections during the cross-examination of the accounting expert.*

Sturges, Yaski's accounting expert, is an experienced certified public accountant who has been retained as an expert witness in about 200 cases. She testified that she was hired in this case to "write up an amortization schedule and figure out who owed who what [and] when." In preparing her report, she reviewed the parties' promissory notes, loan modifications and payment checks. She testified at length about her methodology and conclusions.

Plaintiff's attorney conducted a cross-examination of Sturges but when trial resumed the following day, the sixth day of trial, plaintiff requested permission to personally continue the cross-examination. The court denied the request, and plaintiff then stated that he would discharge his attorney and wanted to represent himself. Counsel advised plaintiff against assuming his own representation late in the trial and the court cautioned plaintiff that he would not be given preferential treatment but held to the same standards of conduct as an attorney. Plaintiff acknowledged the warnings but insisted on representing himself. Plaintiff said he would have liked to continue with counsel, who had done a "good job," but felt it important to cross-examine Sturges personally because "I understand the numbers, I know what's taken place."

6

On appeal, plaintiff complains that "everything shifted against him" when he assumed the cross-examination of Sturges because he was "blocked at every turn" as the "defense piled up objections" and the court sustained them. To the contrary, the record reflects that the trial court was extremely patient and permitted plaintiff to pursue his cross-examination at some length. The objections that ultimately were made and sustained were properly sustained. Plaintiff asked a series of compound and confusing questions about calculations of principal and interest that posited incomplete facts and demanded Sturges to make complex financial calculations on the witness stand. Sturges said she did not understand the questions and opposing counsel objected to Sturges being required to recalculate the loan schedules on the witness stand using incomplete and vague information that plaintiff supplied. The court sustained the objection and urged plaintiff to reformulate his questions. The court explained to plaintiff: "You absolutely are entitled to cross-examine her and undermine any factual findings or assumptions she made in coming to the conclusions in her report. You can ask her hypothetical questions, but what you can't do is to try to use her as your expert to do new calculations to show your point of view."

The court's ruling was correct. An expert witness may be cross-examined as to his or her qualifications, the subject of the testimony, the matters upon which the expert's opinion is based, and the reasons for the opinion. (Evid. Code, § 721, subd. (a).) "[A] wide latitude" is allowed on cross-examination of experts. (*Dincau v. Tamayose* (1982) 131 Cal.App.3d 780, 798-799.) However, "the court may confine cross-examination within reasonable limits and may curtail cross-examination which relates to matters already covered, or which are irrelevant. These are matters clearly within the court's discretion and only a manifest abuse thereof will require a reversal." (*Sullivan v. Dunnigan* (1959) 171 Cal.App.2d 662, 670.) The court here reasonably limited questioning by plaintiff that demanded complex mathematical calculations upon incomplete and complicated financial scenarios. The limitation did not impair a thorough examination of the expert as the court permitted extensive questioning that tested the expert's assumptions, reasons and opinions.

7

*The trial court did not unduly restrict the scope of plaintiff's testimony.*

Plaintiff contends the trial court prevented him from testifying fully when, upon an objection, the court advised him he could testify about his personal knowledge of the loans but "if we get to the stage where [plaintiff] is being asked to opine about accounting methods or critique an expert report," his qualification and designation as an expert knowledgeable in such matters would have to be established.

The court did not unduly restrict plaintiff's testimony. The court held that both plaintiff and Yaski "may testify as percipient witnesses to their understanding of the loans and the terms and negotiations that led up to them, how interest was to be paid and applied to the various loans, and things of that nature." "[A]s a percipient witness, [plaintiff is] entitled to explain his perception of these payments, how they were made, and how they were applied." The court simply cautioned plaintiff against offering "expert opinion" on accounting issues beyond his personal knowledge. Plaintiff argues the court effectively ruled that he could not "testify as to pertinent accounting issues, meaning "calculations as to amounts paid, amounts not credited, balances moved from one note to another and the balance due and accelerated when Yaski began foreclosure" and was "muzzle[d]." The argument is not supported by the record, which shows that plaintiff testified at length, and in great detail, about the loan payments, credits, balances and interest calculations.

*The trial court properly found that the Homeowner Bill of Rights did not apply to the notice of default recorded prior to the statute's effective date.*

The notice of default that initiated these foreclosure proceedings was recorded on July 30, 2010. The recently enacted Homeowner Bill of Rights (HBOR) became effective on January 1, 2013. (Assem. Bill No. 278; Sen. Bill No. 900 (2011-2012 Reg. Sess.) Among other things, HBOR added a provision requiring a mortgage servicer filing a notice of default to review "competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information." (Civ. Code, § 2924.17, subd. (b).) Plaintiff contends that Prime Pacific

8

failed to comply with this provision, which assertedly applies to the notice of default that it recorded.

The trial court properly found that HBOR does not apply to the notice of default that was recorded prior to the effective date of the statute. "California courts comply with the legal principle that unless there is an 'express retroactivity provision, a statute will *not* be applied retroactively unless it is *very clear* from extrinsic sources that the Legislature . . . must have intended a retroactive application.' " (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841, italics in original.) A federal court applying California law noted that HBOR "does not state that it has retroactive effect" and thus does not apply to documents executed before its effective date. (*Rockridge Trust v. Wells Fargo, N.A.* (N.D. Cal. 2013) 985 F.Supp.2d 1110, 1152.)

Plaintiff misunderstands the scope of the trial court's ruling in arguing that the court ruled that HBOR is inapplicable to all aspects of the foreclosure proceeding, including events occurring after the statute's effective date. The court's ruling was not so broad. The court did state, in a passing reference, that the law predating HBOR "govern[s] the foreclosure sale in this case" but in context it is clear the court was referring only to whether HBOR was applicable to the notice of default, which predated HBOR's enactment. Plaintiff makes no contention that any steps taken after the effective date of HBOR failed to comply with the statute.

While not subject to HBOR, the notice of default was subject to statutory standards applicable at the time. Those standards required specification of the nature of the breach and the response needed to cure it. (Civ. Code, § 2924; *Anderson v. Heart Federal Sav. & Loan Assn.* (1989) 208 Cal.App.3d 202, 211-212.) The trial court found that the notice of default met those standards and the finding is supported by substantial evidence.

*The foreclosure sale was properly held after the conclusion of trial, pursuant to the parties' stipulation.*

Three days after the court announced its decision and requested counsel for the defendants to prepare a judgment, the property was sold at a trustee sale. Plaintiff claims

9

the sale was held prematurely. When the issue was raised subsequently, the trial court rejected the contention, finding the sale date in compliance with the parties' stipulation.

The property was sold at a trustee sale on July 5, 2013. The notice of default had been recorded years earlier but the sale was repeatedly postponed after plaintiff filed a bankruptcy petition and then this lawsuit. In July 2012, with an appeal pending from the denial of plaintiff's request for a preliminary injunction, Yaski agreed "to withhold all foreclosure proceedings through the conclusion of trial," in exchange for which plaintiff "withdrew his request for . . . extraordinary relief."

On July 2, 2012, trial concluded with the close of evidence and the court's announcement of its decision in defendants' favor. The court orally gave a detailed explanation of its conclusions and directed defense counsel to prepare a written judgment. Plaintiff did not then request a written statement of decision or a stay of the court's decision. The sale was held on July 5, 2013.Plaintiff later requested a statement of decision which the court filed with the judgment on August 14, 2013.

Plaintiff argues the sale was premature because "[o]ne normally anticipates that a concluded trial means one in which a judgment has been entered." Insofar as plaintiff's contention is that the timing of the sale violated the terms of the parties' stipulation, the relevant inquiry is what the parties intended. "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. (Civ. Code, § 1639.)" (*Founding Members of the Newport Beach Country Club v. Newport Beach* (2003) 109 Cal.App.4th 944, 955.) The stipulation provides only that Yaski would "withhold all foreclosure proceedings through the conclusion of trial." The parties did not specify what they meant by "the conclusion of trial." Generally, "[t]he words of a contract are to be understood in their ordinary and popular sense." (Civ. Code, § 1644.) In *Zenker-Felt Imports v. Malloy* (1981) 115 Cal.App.3d 713, 718, the court determined that " 'at the time of trial' in the literal and conventional sense of that term" means "the proceeding at which evidence is received and the action is submitted for decision." Thus, where a party must request a statement of findings "at the time of trial,"

it is the close of evidentiary proceedings and not entry of judgment that ends "the time of trial." (*Id.* at pp. 716-718.) Similarly, the parties' use of the term "the conclusion of trial" is reasonably interpreted to mean the close of evidentiary proceedings, which is its "ordinary and popular sense," as the trial court implicitly found. (Civ. Code, § 1644.) Plaintiff failed to present any extrinsic evidence supporting a contrary interpretation. Moreover, July 2, 2012 was reasonably considered to mark "the conclusion of trial" because both the evidence closed and the court announced its decision on that day. On this record, we cannot say the trial court erred in concluding the parties intended to stay the sale only until the conclusion of evidentiary proceedings and the court's announcement of its decision and, thus, that "there was no legal impediment" to the sale.

Plaintiff also argues that, apart from the stipulation, the foreclosure sale was premature under statutory law. Civil Code section 2924g, subdivision (d) provides, in relevant part, that a "sale shall be conducted no sooner than on the seventh day after the earlier of (1) dismissal of the action or (2) expiration or termination of the injunction, restraining order, or stay that required postponement of the sale, whether by entry of an order by a court of competent jurisdiction, operation of law, or otherwise, unless the injunction, restraining order, or subsequent order expressly directs the conduct of the sale within that seven-day period." The statute is inapplicable here. There was no dismissal or expiration of a court-issued injunction, restraining order or stay. The only applicable time limitation was that established by the parties' stipulation permitting a sale "at the conclusion of trial."

*Substantial evidence supports the trial court's finding that the trustee did not breach its duties or act negligently in the foreclosure proceedings.*

Plaintiff claims trustee Prime Pacific violated its duty to act impartially and negligently accepted Yaski's information concerning plaintiff's default on the loan without independently verifying the information. The court found the information supplied by Yaski to be substantially correct, containing only a slight understatement of the amount in default, and no "improper or negligent acts" by the trustee.

11

"A trustee under a deed of trust has neither the powers nor the obligations of a strict trustee; rather, he serves as a kind of common agent for the trustor and the beneficiary. [Citations.] His agency is a passive one, for the limited purpose of conducting a sale in the event of the trustor's default or reconveying the property upon satisfaction of the debt." (*Hatch v. Collins* (1990) 225 Cal.App.3d 1104, 1111.) "[A] trustee has a general duty to conduct the sale 'fairly, openly, reasonably, and with due diligence,' exercising sound discretion to protect the rights of the mortgagor and others." (*Ibid.*)

Substantial evidence supports the trial court's finding that the trustee here fully and fairly dispatched its duties. The trustee violated no duty to plaintiff in issuing a notice of default when plaintiff was, in fact, in default. Plaintiff claims the trustee failed to act impartially but the record fails to support the claim. Mary Morris, the owner of Prime Pacific, testified she has "a fundamental obligation to both the beneficiary and the trustor" and is duty-bound to use only "competent and reliable information in performing [her] services." Morris insisted she met those obligations here and plaintiff has failed to produce evidence refuting her testimony.

Plaintiff argues that Morris displayed partiality in her testimony that she would not postpone the pending sale of the Caspar property absent court order, party stipulation or directions from the beneficiary. Morris denied having the "authority" to postpone the sale, which plaintiff characterizes as proof she "viewed her role simply to take orders from Yaski and his attorney." A trustee must exercise independent discretion as an impartial third party with duties to both beneficiary and trustor. (*Ainsa v. Mercantile Trust Co. of San Francisco* (1917) 174 Cal. 504, 510; *Baron v. Colonial Mortgage Service Co.* (1980) 111 Cal.App.3d 316, 323.) The evidence here, however, fails to establish the trustee breached this duty. Morris acknowledged her responsibility to ensure the sale did not harm the interests of either Yaski or plaintiff. Morris's refusal to postpone the sale absent direction from a "higher" authority reflects no more than that she saw no reason to postpone the sale and would do so only upon direction from one with the authority to give such a direction.

Plaintiff argues that an indemnification agreement between Prime Pacific and Yaski, pursuant to which Yaski hired counsel to represent both himself and the trustee, creates a conflict of interest that breaches the trustee's duty of impartiality. " 'The trustee of a deed of trust is not a true trustee, and owes no fiduciary obligations; he merely acts as a common agent for the trustor and the beneficiary of the deed of trust.' " (*Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 508.) As a common agent, the trustee is obligated to act impartially. The trial court found: "[t]he fact there's an indemnification agreement that requires Mr. Yaski to assume the cost of defense for Prime Pacific does not, on its face, create a conflict of interest." We agree. Plaintiff cites no authority for the proposition that a trustee's acceptance of indemnification from the beneficiary is a breach of the trustee's duty of impartiality.

*Substantial evidence supports the finding that the notice of default was proper.*

Plaintiff argues the notice of default was defective in failing to accurately describe the claimed default. The court found the notice correctly stated that plaintiff was in default, as he was in arrears on his interest payments. The only inaccuracy was in the amount due. The notice listed the amount required to cure the default as $40,421, which was about $3,000 less than the amount determined at trial. The court stated: "[Plaintiff] was legally entitled to reinstate the loan by paying a sum less than he actually owed, therefore he did not demonstrate prejudice as a result of the errors in the notice of default." The court also noted that plaintiff "never attempted to avoid foreclosure by tendering *any* amount to Prime Pacific.

The court correctly held that the notice of default was not invalidated by the understatement of the amount due. A notice of default must describe "the nature of each breach actually known to the beneficiary and of his or her election to sell or cause to be sold the property to satisfy that obligation and any other obligation secured by the deed of trust or mortgage that is in default." (Civ. Code, § 2924, subd. (a)(1)(C).) "A purpose of the required statement in the notice of default is to afford the debtor an opportunity to

13

cure the default and obtain reinstatement of the obligation within three months after the notice of default." (*System Inv. Corp. v. Union Bank* (1971) 21 Cal.App.3d 137, 153.)

A notice of default is not void under Civil Code section 2924 where it contains only slight procedural irregularities that result in no prejudice to the plaintiff. (See *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 94 [premature mailing of sale notice did not justify setting aside sale where borrowers had adequate notice of sale date].) Plaintiff was not prejudiced by the slight inaccuracy in the notice of default, which understated the amount due. He was entitled to reinstatement of the loan had he paid the listed amount, which was less than he actually owed. (*Tomczak v. Ortega* (1966) 240 Cal.App.2d 902, 904.) His power of redemption therefore was not adversely effected by the minor irregularity in the notice of default.

*Substantial evidence supports the finding that the loan was not usurious.*

Plaintiff contends the "loan transaction was infected with usury and the usury was never purged." The trial court rejected the contention, finding that prior loans "which bore a facially usurious interest rate of 12.5%" were cancelled and superseded by later nonusurious loans, including the one foreclosed. The court's finding is well supported by the record.

As explained above, the parties' financial relationship began in 2002 when plaintiff borrowed $375,000 at 8 percent interest. Plaintiff borrowed additional amounts over the years, at various rates of interest. The highest rate was on three notes executed between May and August 2006, when plaintiff borrowed a total of $185,000 at 12.5 percent interest, which exceeded the lawful rate of 10 percent. (Cal. Const., art. XV, § 1.)

The promissory notes bearing 12.5 percent interest were in effect for only a few months, until September 2006, when the parties executed a new note with a single consolidated balance of $1.2 million. The new note bore interest at the rate of 8 percent on $545,000, 10 percent on $450,000 and 12.5 percent on $205,000, which was an effective rate of 9.52 percent. In November 2007, plaintiff sold 100 acres of the Caspar property and applied $400,000 from the sale proceeds to reduce his $1.2 million debt. In

14

April 2009, the parties cancelled the 2006 note and executed a new promissory note for $800,000, with interest rates of 8 percent on $545,000 and 10 percent on $255,000, or an effective rate of 8.64 percent. The April 2009 note is the one foreclosed.

The trial court properly found that the only notes bearing a usurious rate of interest were the three notes executed between May and August 2006, charging 12.5 percent. Plaintiff disputes this fact and contends he paid usurious interest "for years" under the subsequent September 2006 note. The September 2006 note does state 12.5 percent to be the rate charged on a portion of the principal but the effective interest rate on the entire principal is 9.52 percent. "When calculating the true effective interest rate that is being charged to the borrower, the 'interest' charged to the borrower is calculated upon the net amount of the loan proceeds disbursed to the borrower, plus costs and charges which are paid properly by the borrower, and not on the face amount of the note." (8 Miller & Starr, Cal. Real Estate 3d § 21.15.) "The true principal, the amount upon which a transaction is tested for usury, is the actual amount of which the borrower had the use, detention, or forbearance." (*C & K Investments v. Fiesta Group, Inc.* (Tex.App. 2007) 248 S.W.3d 234, 242.) Sturges thus properly determined the effective interest rate by calculating the annual interest paid on the entire $1.2 million loan proceeds.

The trial court also properly found that the usurious notes executed in 2006 did not taint the 2009 loan that is the predicate of the foreclosure proceedings. Plaintiff invokes the principle that "If a transaction is usurious in its inception, it remains usurious until purged by a new contract; and all future transactions connected with or growing out of the original are usurious and without valid consideration." (*Westman v. Dye* (1931) 214 Cal. 28, 38.) "Every renewal of a note given for a usurious loan of money is subject to the defense of usury." (*Ibid.*) Here, we do not have the renewal of a note but a new contract that purges the prior usury. "Though a contract is tainted with usury, the abandonment of the usurious agreement and the execution of a new obligation for the amount of the actual debt free from the usury and bearing only legal interest, purges the original usury and makes the second obligation valid and enforceable." (*Whittemore Homes, Inc. v. Fleishman* (1961) 190 Cal.App.2d 554, 560.)

15

"Novation is the substitution of a new obligation for an existing one." (Civ. Code, § 1530.) Novation is made "[b]y the substitution of a new obligation between the parties, with intent to extinguish the old obligation." (Civ. Code, § 1531, subd. (1).) A novation exits where the prior contract "was canceled and obliterated as completely as though it had never had existence. It means that . . . all rights are to be measured and determined under the new substituted obligation as completely as though it had never been preceded by an earlier contract." (*Beckwith v. Sheldon* (1913) 165 Cal.319, 323-324.)

It is clear on this record that the parties substituted the September 2006 note for the prior notes executed between December 2002 and August 2006 with the intent to extinguish the prior notes. The September 2006 note expressly states, in bold print: "This note supersedes any and all previous notes and all previous notes are null and void at creation of this note." (Format altered.) Plaintiff admitted at his deposition that all prior notes, including the notes bearing 12.5 percent interest, were "cancelled" by the new note executed in September 2006. The parties followed the same course when they cancelled the September 2006 note and executed the April 2009 note. Substantial evidence supports the trial court's finding that prior loans "which bore a facially usurious interest rate of 12.5%" were cancelled and superseded by later nonusurious loans, including the one foreclosed.

**Disposition**

The judgment is affirmed.

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Jenkins, J.

16